Tuesday                 30th

December, 2003.


7-Eleven, Inc., f/k/a
 The Southland Corporation,                                             Appellant,

 against            Record No. 2380-01-2
                    Circuit Court No. HN-2268

Department of Environmental Quality,                           Appellee.


Upon a Rehearing En Banc

Before Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner, Frank,
Humphreys, Clements, Felton and Kelsey


For reasons stated in writing and filed with the record, the Court is of opinion that there is

error in the judgment appealed from.  Accordingly, the opinion previously rendered by a panel of

this Court on December 10, 2002 is withdrawn and the mandate entered on that date is vacated.

The judgment of the trial court is reversed and annulled, and the matter is remanded to the trial

court for reconsideration in accordance with the views expressed in the written opinion of this

Court.

This order shall be certified to the trial court.


A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

Present:   Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner, Frank,
            Humphreys, Clements, Felton and Kelsey
Argued at Richmond, Virginia


7-ELEVEN, INC., F/K/A
 THE SOUTHLAND CORPORATION

                                                        OPINION BY
v.        Record No. 2380-01-2              JUDGE JAMES W. BENTON, JR.
                                                     DECEMBER 30, 2003
THE DEPARTMENT OF
 ENVIRONMENTAL QUALITY


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge

Wyatt B. Durrette, Jr. (Derrick L. Walker; Durrette
Bradshaw, P.L.C., on briefs), for appellant.

John R. Butcher, Special Assistant Attorney General
(Jerry W. Kilgore, Attorney General; Roger L. Chaffe,
Senior Assistant Attorney General, on brief), for appellee.


The Department of Environmental Quality denied a substantial part of a request by

7-Eleven, Inc. for reimbursement from the Petroleum Storage Tank Fund for payments 7-Eleven

made when it settled a suit brought by a third-party for property damage related to a petroleum

spill.  7-Eleven contends the trial judge erroneously upheld that decision by (1) applying

incorrect standards on review, (2) ruling that the issue on review was within the Department's

specialized competence and expertise, (3) failing to properly consider evidence in the record, and

(4) upholding the Department's Tank Fund guidelines.  In reviewing these issues, we must

examine the term "costs" in the context of a statutory indemnity scheme.

A divided panel of this Court affirmed the trial judge's decision.  See 7-Eleven, Inc. v. Dep't of Env. Quality, 39 Va. App. 377, 573 S.E.2d 289 (2002).  We granted 7-Eleven's petition for rehearing *en banc*, and, for the reasons that follow, we reverse the judgment.

I.

The Department of Environmental Quality, which the legislature created to consolidate the programs of the State Water Control Board and four other agencies, see Code § 10.1-1182 *et seq*., administers the Petroleum Storage Tank Fund for the Board.  See Code §§ 62.1-44.34:10 through 62.1-44.34:13.  In pertinent part, the Tank Fund statute provides as follows:

> 2.  Disbursements from the Fund may be made only for the following purposes:
> a.  Reasonable and necessary per occurrence costs incurred for releases . . . by the owner or operator who is the responsible person, in taking corrective action for any release of petroleum into the environment from an underground storage tank which are in excess of the per occurrence financial responsibility requirement imposed in subsection B of § 62.1-44.34:12, up to one million dollars.
> b.  Reasonable and necessary per occurrence costs incurred for releases . . . by the owner or operator who is the responsible person for compensating third parties, including payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank, which are in excess of the per occurrence financial responsibility requirement imposed by subsection B of § 62.1-44.34:12, up to one million dollars.  Disbursements for third party claims shall be subordinate to disbursements for the corrective action costs in subdivision A 2 a of this section.

Code § 62.1-44.34:11(A)(2).

The evidence in the record proved that in June 1990, 7-Eleven reported to the Board a leaking gasoline pump at one of its properties in Henrico County.  After an environmental consultant found petroleum in the ground and in a spring and a stream, 7-Eleven hired a contractor to clean the contaminated area, which included a nearby parcel of property owned by Hechinger, Inc.  The corrective action, however, only partially abated the petroleum plume in the groundwater.  As permitted by the Tank Fund, 7-Eleven requested reimbursement of

$599,746.94 from the Board for its "reasonable and necessary . . . costs" in correcting the release of petroleum into the environment. See Code § 62.1-44.34:11(A)(2)(a). The Board, acting through the Department, approved $458,838.74 of the clean-up costs. After subtracting $50,000 for 7-Eleven's financial responsibility, see Code § 62.1-44.34:12(B), the Board reimbursed 7-Eleven for $408,838.74 of its costs. Those costs and reimbursements are not at issue in this appeal.

In April 1995, Hechinger sued 7-Eleven in the Circuit Court of the City of Alexandria for property damage caused by the petroleum release, alleging negligence, trespass, nuisance, and statutory liability under Code § 62.1-44.34:18(C)(4). Hechinger's motion for judgment sought damages of $2,000,000, interest, costs, and attorneys' fees. While the litigation was pending, 7-Eleven notified the Department of its potential claim against the Tank Fund for damages to Hechinger's property. See Code § 62.1-44.34:11(A)(2)(b). After 7-Eleven stipulated to statutory liability under Code § 62.1-44.34:18(C)(4), the case went to trial in the circuit court on the issue of damages. During the second day of trial, the parties agreed that 7-Eleven would pay Hechinger $575,000 as a settlement of its $2,000,000 claim.

7-Eleven notified the Department of the settlement and sought reimbursement from the Tank Fund. See Code § 62.1-44.34:11(A)(2)(b). In support of its claim, 7-Eleven presented to the Department various documents, including exhibits prepared for and used at trial. The Department held an informal fact-finding proceeding and allowed 7-Eleven to later submit additional evidence. Based on its consideration of the evidence, the Department found that 7-Eleven "was the responsible person for this release and the release was from a regulated [underground storage tank]." The Department awarded 7-Eleven $103,117 as reimbursement for payment of property damage to Hechinger. The Department found that this amount represented the diminution in the market value of Hechinger's property.

7-Eleven appealed to the circuit court, alleging the case decision was unlawful. Following written briefs and oral argument, the trial judge ruled that the Department's decision concerning "reasonable and necessary per occurrence costs" for compensating Hechinger for property damage was an issue involving the Department's special expertise. Finding that the decision was supported by substantial evidence and was not arbitrary and capricious, the trial judge upheld the Department's decision to award only partial reimbursement to 7-Eleven. This appeal followed.

## II.

In simple terms, the issue in this appeal is whether, in evaluating the "reasonable and necessary . . . costs" 7-Eleven incurred in compensating Hechinger for property damage caused by the petroleum release, the Department could disregard the reasonableness of the $575,000 settlement. Noting that its liability was indisputable, 7-Eleven contends the Department erred by failing to consider the factors reflective of the reasonableness of the settlement, including "the strength of Hechinger's case heading into trial, 7-Eleven's exposure to liability and damages, the expense to the parties, the complexity of the issues presented in the litigation, the likely duration of the litigation, the amount offered at settlement, and the state of the proceedings at the time of the settlement." The Department responds that the trial judge correctly ruled that substantial evidence supported the Department's decision.

## A.

The record reflects that neither the Department nor the trial judge found that the settlement was unreasonable or unnecessary given the circumstances of the litigation. Moreover, the Department found that "[a]t a minimum, information contained in the Department's corrective action files demonstrates that the contamination . . . originated from the [7-Eleven] release" and, thus, determined that 7-Eleven's liability was "fairly disputable."

−5−

To the extent the Department concluded, without determining the reasonableness of the settlement, that 7-Eleven's settlement costs were not recoverable, the Department's decision was based on an interpretation of Code § 62.1-44.34:11(A)(2)(b) that excluded from the Code's definition of "costs" the kind of property damage settlement costs 7-Eleven incurred. Dismissing 7-Eleven's claims on its appeal to the circuit court, the trial judge ruled that "[b]ecause the statute does not tie the reasonableness requirement to the litigation arena, the Department did not need to consider the factors listed by [7-Eleven] and failure to do so was not error." We hold that those decisions are legally flawed.

B.

In reviewing those decisions, we hold that no special agency expertise is necessary for a resolution of the issues this appeal raises.

> The sole issue involves a question of statutory interpretation. The issue does not involve "the substantiality of the evidential support for findings of fact," which requires great deference because of the specialized competence of the agency. Instead, when, as here, the question involves a statutory interpretation issue, "little deference is required to be accorded the agency decision" because the issue falls outside the agency's specialized competence.

Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996) (citation omitted). "The reviewing court may set the agency action aside, even if it is supported by substantial evidence, if the court's review discloses that the agency failed to comply with a substantive statutory directive." Browning-Ferris Indus. of South Atlantic, Inc. v. Residents Involved in Saving the Env't, Inc., 254 Va. 278, 284, 294 S.E.2d 431, 434 (1997).

C.

The principle is well established that "[w]ords in a statute are to be construed according to their ordinary meaning, given the context in which they are used." Grant v. Commonwealth, 223 Va. 680, 684, 292 S.E.2d 348, 350 (1982); Loyola Fed. Savings and Loan Ass'n v. Herndon Lumber & Millwork, Inc., 218 Va. 803, 805, 241 S.E.2d 752, 753 (1978). The clear wording of Code § 62.1-44.34:11(A)(2)(b) provides that an owner may recover "[r]easonable and necessary . . . costs incurred for releases [of petroleum from an underground storage tank] . . . , including payment of judgments for bodily injury and property damage." In the context of the statute, the word "costs" means either "an item of outlay incurred in the operation of a business enterprise," Webster's Third New International Dictionary 515 (1981), or, more generally, "the expenditure or outlay of money." Id. Thus, if the litigation that Hechinger instituted against 7-Eleven for property damage caused by the spill had gone to judgment in Hechinger's favor, the judgment amount certainly would have established the base-line for the computation of 7-Eleven's reasonable and necessary costs for purposes of Code § 62.1-44.34:11(A)(2)(b), subject only to the statutory limitation. A plain reading of the statute permits no other conclusion.

Except as generally circumscribed by the Tank Fund scheme, Code § 62.1-44.34:11(A)(2)(b) does not contain an enumerated listing of costs to be reimbursed and clearly does not exclude money paid in a settlement for property damage as a factor to be used in determining the "[r]easonable and necessary . . . costs" of an owner. Moreover, the statutory directive to consider "payment of judgments for . . . property damage caused by the release of petroleum" as a measure of the "[r]easonable and necessary per occurrence costs" clearly encompasses settlements that occur during litigation concerning the property damage. Because the statute is without limitation in defining the type of costs an owner, who is the responsible

– 7 –

party for compensating third parties, can recover for compensating a third party for damage caused by a petroleum release from an underground tank, a plain reading of the statute manifests an intention that settlement expenses are "costs" contemplated by the legislature.

By specifically denoting that "[r]easonable and necessary . . . costs" would "includ[e] payment of judgments for . . . property damages," the legislature obviously contemplated that litigation might occur and that any resulting judgment would be included in the determination of costs to be reimbursed from the Tank Fund. Code § 62.1-44.34:11(A)(2)(b). In addition, the statutory term "costs," is inclusive of the expenditures an owner makes to third parties for property damage and does not pertain exclusively to judgments as the Department suggests. The clear and ordinary language of the statute manifests that "[b]y the use of the term 'including,' [the legislature] indicated that the specifically mentioned [payments] are not exclusive." Herb's Welding, Inc. v. Gray, 470 U.S. 414, 423 n.9 (1985). We hold that the wording of the statute leaves no doubt that the legislature envisioned legal actions being brought against owners who are the responsible parties for causing petroleum spills and that the legislature intended that the monetary result of those legal actions for property damage, including settlements, be included as a cost to be reimbursed.

Furthermore, our reading of the statute must be governed by the following principles:

> Every statute is to be read so as to "promote the ability of the enactment to remedy the mischief at which it is directed." Natrella v. Board of Zoning Appeals, 231 Va. 451, 461, 345 S.E.2d 295, 301 (1986) (quoting Jones v. Conwell, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984)). The ultimate purpose of all rules of construction is to ascertain the intention of the legislature, which, absent constitutional infirmity, must always prevail. All rules are subservient to that intent. Shackelford v. Shackelford, 181 Va. 869, 877, 27 S.E.2d 354, 358 (1943). Further, it is a universal rule that statutes . . . which are remedial in nature, are to be "construed liberally, so as to *suppress the mischief* and advance the remedy,"

> as the legislature intended. Shumate's Case, 56 Va. (15 Gratt.)
> 653, 661 (1860) (emphasis added).

Board of Sup. v. King Land Corp., 238 Va. 97, 103, 380 S.E.2d 895, 897-98 (1989).

Our holding is consistent with the legislative policy manifested by the statute. The Tank Fund is a part of a broader scheme of the State Water Control Law adopted to protect the quality of state waters and to prevent any increase in pollution. Code § 62.1-44.2. "Monies held in the Tank Fund originate from expenses and penalties recovered pursuant to various provisions of state and federal law, fees levied on fuel sold, delivered and used in the Commonwealth, and interest earned on monies in the Fund." May Dep't Stores Co. v. Commonwealth of Va., Dep't of Environmental Quality, 29 Va. App. 589, 598, 513 S.E.2d 880, 884 (1999) (citing Code §§ 62.1-44.34:11, 62.1-44.34:13). The Tank Fund was designed to provide a prompt and efficient means of abating pollution caused by underground storage tanks and to facilitate payment of compensation to third parties who have suffered bodily injury and property damage caused by release of petroleum from underground storage tanks. The statute renders irrelevant whether the third party has been compensated for those injuries by a judgment or by a reasonable settlement prior to judgment.

In determining the costs to be reimbursed, the Department can only fulfill its responsibility under the statute -- to ensure that the public interest is served -- if it considers the reasonableness of the cost of settling litigation. This conclusion is buttressed by long-standing "settled principles of law," which the Supreme Court has recognized as a matter of public policy and equity, that "'[t]he law favors compromise and settlement of disputed claims.'" Snyder-Falkinham v. Stockburger, 249 Va. 376, 381, 457 S.E.2d 36, 39 (1995) (citation omitted); see also Eggleston v. Crump, 150 Va. 414, 418-19, 143 S.E. 688, 689 (1928). Indeed, in this case, where the issue of liability is uncontested, it would be contrary to the clear meaning of the statute and, furthermore, would be incongruous and injurious to public policy to hold that

the Department could fail to consider the settlement costs as a factor in determining reasonable and necessary costs for property damage caused by 7-Eleven's petroleum spill.

The Department's interpretation would lead to a costly and irrational result. Because the Department's decision creates uncertainty in what is reimbursable, owners who caused spills would be forced to reject most reasonable settlements in favor of adjudication. Owners would refuse to settle whenever the difference between the proposed settlement and what they estimate the Department is willing to pay is greater than the difference between the potential judgment and the fund's maximum pay-out limit. Assuming judgments are generally higher than settlements, the Department generally will pay more out of the Tank Fund because owners would have great incentive to allow a jury to adjudicate the claims brought by third parties.

The Department does not offer and we do not discern any logical reason why the legislature would have intended to differentiate between reimbursement for settlements and reimbursement for judgments. When we read the statute, as we must, to promote its ability to "remedy the mischief at which it is directed," King Land Corp., 238 Va. at 103, 380 S.E.2d at 897, the statute inexorably and logically manifests the conclusion that settlements of legal actions would occur, that settlements would be judged by determining the reasonableness of the settlement, and that the amount of a reasonable settlement would also be an item the Department would reimburse as "reasonable and necessary . . . costs." Thus, we hold that the Department's interpretation of the statute to preclude recovery of settlement costs is contrary to a plain reading of the statute which requires, subject only to the statutory limitation of one million dollars, that costs an owner incurs for compensating third parties for property damage caused by petroleum releases be reimbursed based on whether they are reasonable and necessary.

D.

Significantly, the Department now recognizes in the preamble to its Guidelines, which were adopted on February 12, 1998, after 7-Eleven settled the litigation, that "disbursements . . . may be made for costs incurred . . . to compensate third parties for the *reasonable and necessary costs of settlements* and judgments for . . . property damage." Virginia Petroleum Storage Fund Third Party Disbursement Guidelines (emphasis added). To implement that policy, the Guidelines now provide that the Department will "*review all settlements for reasonableness*." Guidelines, VIII (A)(3) (emphasis added). This policy, which the Department apparently derives from the authority of the statutes, is precisely the remedy 7-Eleven contends is mandated by the statutes and pre-existed the adoption of the Guidelines.

Neither the Department in its fact finding nor the trial judge on review determined that $575,000 was an unreasonable amount to settle the pending property damage litigation or that $575,000 was not within the range of a judgment of a rational jury had the litigation, which already had consumed a day and one-half at trial, proceeded to judgment on the merits. See Dauphin Deposit Bank and Trust Co. v. Hess, 727 A.2d 1076, 1078 (Pa. 1999) (holding that criteria used in assessing the reasonableness of settlement "include evaluations of (1) the risks of establishing liability and damages, (2) the range of reasonableness of the settlement in light of the best possible recovery, (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation, (4) the complexity, expense, and likely duration of the litigation, (5) the stage of the proceedings and the amount of discovery completed, (6) the recommendations of competent counsel, and (7) the reaction of the [beneficiaries] to the settlement"). Likewise, the record contains no finding that a $575,000 judgment by a jury for the property damage would have been so excessive as to require a trial judge to set it aside or as to require an appellate court to do the same. See Edmiston v. Kupsenel, 205 Va. 198, 202, 135

-11-

S.E.2d 777, 780 (1961). The Department's implicit suggestion that, prior to the adoption of the

Guidelines, it had the *discretion* to refuse to consider the settlement as an element of "costs" is

simply based on a misreading of the Tank Fund statutes.

E.

Without assessing any of the issues concerning the likelihood of success at trial or the

reasonableness of the settlement, the Department made its own judgment that the lowest

valuation of damage was more credible and found as follows:

> Based on the valuation information provided, a reasonable range for the permanent damages was between $138,700 and $103,117 (i.e., $938,700 or $903,117 minus $800,000). It is not necessary to make an adjustment to reflect partial cure costs, because the $800,000 offer [to purchase the property] appeared to be from an arms-length buyer and was made at a time when the cure of the property was nearly complete. Additionally, the evidence does not clearly demonstrate that topographical problems at the site affected the offer price. Therefore, [7-Eleven] will be given the benefit of the doubt on this issue, and no adjustment will be required to address this alleged cause of reduced property value. For the foregoing reasons, third party claim costs in the amount of $103,117 are approved, as this amount reflects actual market values.

This record clearly "demonstrate[s] an error of law . . . [concerning] compliance with

statutory authority." Code § 9-6.14:17. In short, the Department did not evaluate the

reasonableness and necessity of the settlement but, instead, reviewed the evidence developed

during the litigation and decided, independent of the litigation risk, an amount it believed

represented the diminution of the fair market value of the property. The Department then ruled

that this amount constituted the reasonable and necessary costs to be reimbursed.

Put simply, the Department's decision was contrary to the plain language of the statute.

"Since the issue before us is purely one of law, containing no underlying factual issues, we do

not apply a presumption of official regularity or take account of the experience and specialized

competence of the administrative agency." Browning-Ferris Indus., 254 Va. at 284, 492 S.E.2d

-12-

at 434.  A reviewing court may reverse an agency's determination where the agency's decision is based on an improper statutory interpretation.  Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 242, 247, 369 S.E.2d 1, 10 (1988).

> Code § 9-6.14:19, a part of the Administrative Process Act, controls the action a . . . court may take when it finds a case decision "to be not in accordance with law under § 9-6.14:17." Among the errors of law addressed in the latter statute is failure of the agency to comply "with statutory authority" and failure of the agency to observe "required procedure."  § 9-6.14:17(ii) and (iii). When the court finds the case decision to be unlawful on these grounds, it "shall suspend or set it aside and remand the matter to the agency for such further proceedings, if any, as the court may permit or direct in accordance with law."  § 9-6.14:19.

Virginia Bd. of Med. v. Fetta, 244 Va. 276, 280, 421 S.E.2d 410, 412 (1992).

For these reasons, we hold that because Code § 62.1-44.34:11(A)(2)(b) requires the Department, in administering the Tank Fund, to assess the "reasonable and necessary . . . costs incurred for releases . . . by the owner . . . for compensating third parties, including payments of judgments for . . . property damage caused by the release," the Department erred when it failed to assess the reasonableness of the settlement and failed to determine as a factor in reimbursing 7-Eleven for its reasonable and necessary costs the settlement amount paid by 7-Eleven to Hechinger.

### III.

7-Eleven additionally contends the Department's Guidelines impermissibly restrict recovery of property damage.  The Department responds that the question of which costs are eligible for reimbursement is an issue of fact and that 7-Eleven's evidence failed to prove other costs were attributable to the spill.  Alternatively, the Department contends that 7-Eleven's other costs were "intangible property damage costs and interest," which the Department properly excludes from the Guidelines.  Assessing these arguments, the trial judge ruled that "[t]he Department [was within] . . . its discretion [in concluding] that those costs associated with

-13-

permanent damages to property which are both reasonable and necessary are either the diminution in value of the property or the cost to restore the property."

A.

The Guidelines provide in pertinent part as follows:

> Costs incurred by owners/operators, in compensating third parties for real property damage proximately caused by a release from an owner's/operator's eligible tank, which are eligible for disbursement from the Fund include the following:
> 1. For temporary damage to real property, the decrease in rental value during the continuance of the injury, and
>
> 2. For permanent damage to real property, the lower of (I) the diminution in the value of the real property and fixtures or (as determined after completion of corrective action) (ii) the cost to restore the real property to its condition prior to the injury.

Guidelines VI(C).

In granting the Department the discretion to determine whether costs an owner incurred "for compensating third parties . . . for property damage caused by the release of petroleum" were reasonable and necessary, Code § 62.1-44.34:11(A)(2)(b), the General Assembly obviously intended that the Department determine, on a case-by-case basis, which costs would be reimbursed. In other instances, where a statute has given an agency such discretion, we have reversed agency action, noting that, "[a]lthough the statute authorizes the use of discretion, the current policy guidelines allow no discretion to be exercised in determining [the statutorily delegated function]." Woods v. Commonwealth, 26 Va. App. 450, 458-59, 495 S.E.2d 505, 509 (1998).

By restricting recovery of property damages to only those specifically listed in the Guidelines, the Department concluded as a matter of law that other costs would not be reimbursed. The trial judge ruled that the Department's interpretation of permissible damages

-14-

for permanent injury to real property was "implemented through the Guidelines . . . [and was not] arbitrary and capricious." We hold that the trial judge erred in applying this standard.

B.

Limiting permanent damages to the diminution in the value of the property, the Department ruled as follows:

> Upon site closure, contamination remained on the Hechinger property. The Regional Office's July 7, 2000 memorandum indicates that it is simply not possible to predict how long it will take for natural attention [sic] to return the site to background levels. [7-Eleven] provided no evidence and no evidence exists in the Agency's records that indicates the remaining contamination will attenuate within a known time frame. Consequently, it is appropriate to treat the injury as permanent. The measure for permanent injury to real property pursuant to Packett v. Herbert is the permanent diminution in the value of the property.
> To determine the permanent diminution in the value of the property, the fair market value of the property after the injury is subtracted from the fair market value of the property before the injury.

The Department, however, improperly relied on Packett v. Herbert, 237 Va. 422, 377 S.E.2d 438 (1989), to conclude that damages are limited to the diminution in the value of the property.

The Supreme Court long ago rejected an appellant's contention "that inconsistent elements of damage are claimed . . . because the permanent depreciation in the market value of property comprehends the whole damage that can be caused to property by the establishment of a permanent nuisance." Virginia Railway Co. v. London, 114 Va. 334, 343, 76 S.E. 306, 307 (1912). The principle is well settled in Virginia that a party may recover for all damages proximately caused by another party's tortious conduct. Lochaven Co. v. Master Pools by Schertle, Inc., 233 Va. 537, 541, 357 S.E.2d 534, 537 (1987). The Supreme Court held in Lochaven Co. that "[t]he measure of damages in a negligence action is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct." 233 Va. at 541, 357 S.E.2d at 537. Indeed, the Court has held that a jury may properly "assess

damages for defendant's conduct in diminishing the value of plaintiffs' properties, for continuously interfering with the enjoyment of that property, and for causing material disturbance or annoyance to plaintiffs in their use and occupation of the property." National Energy Corp. v. O'Quinn, 223 Va. 83, 91, 286 S.E.2d 181, 186 (1982). See also Bowers v. Westvaco Corporation, 244 Va. 139, 149, 419 S.E.2d 661, 667 (1992) (restating the Court's prior holdings that "'[a] nuisance may diminish value of realty . . . [and] also may interfere with some right incident to the ownership or possession of real property'").

Where, as 7-Eleven contends in this case, Hechinger sued for and was entitled to carrying costs, lost profits, and lost investment income proximately caused by 7-Eleven's conduct, those costs are recoverable under Virginia tort law if proved. O'Quinn, 223 Va. at 91, 286 S.E.2d at 186. See also Restatement (Second) of Torts § 929 (1979) (providing that damages for injury to real property include compensation for loss of use of the property and other consequential injuries in addition to any permanent property damage, whether measured by restoration or market value). Indeed, Code § 62.1-44.34:18(C)(4), which addresses an owner's liability for the petroleum spill, recognizes potential liability for "damage to . . . property, . . . loss of income, loss of the means of producing income, or loss of the use of the damaged property for . . . commercial, industrial, . . . or other reasonable uses, caused by such discharges."

The record contains the expert appraisals on the pre-injury and post-injury value of Hechinger's property. The record also contains the opinion of Salzman Real Estate Services, Inc., an expert hired by Hechinger, that Hechinger incurred as a result of the spill lost rental income of $710,000 and lost investment returns of $550,000. Salzman calculated that Hechinger had also incurred and paid as property expenses resulting from the spill $283,000 in additional insurance, taxes, administrative expenses, legal fees, and expert fees. The Department, however, did not consider whether the expenses Hechinger claimed in the litigation represented the

-16-

damage caused by the petroleum spill. Once the Department summarily concluded that it was appropriate to treat the damages in the present case as permanent because no evidence proved that the damage to the property "[would] attenuate within a known time frame," the Department declined to address whether damages, other than the diminution in the value of the property, were also appropriate. Indeed, the Department's decision states that proof of lost investment income, lost rental income, and carrying costs were not considered because they did not conform to the damage formula prescribed in Packett.

In Packett, upon which the Department relied in limiting its award to only diminution in value of the property, the Supreme Court did not preclude recovery of other damages. See 237 Va. at 426-27, 377 S.E.2d at 442. The Court simply held that it would be improper to allow both an injunction and permanent damages because both remedied future harm, i.e., while permanent damages compensate for the future harm, an injunction eliminates future harm. Id. In so ruling, the Court noted that in Miller v. Trueheart and Others, 31 Va. 569, (4 Leigh) 569 (1833), a party properly was entitled to temporary damages and later an injunction. Packett, 237 Va. at 427, 377 S.E.2d at 442. Such damages do not constitute an improper double compensation to the injured party because the temporary damages compensate for past harm while the injunction remedies future harm. See Raleigh Court Corp. v. Faucett, 140 Va. 126, 143, 124 S.E. 433, 438 (1924) (permitting recovery for "temporary and permanent damage . . . done to the plaintiff's lot [of land]"). It is evident from these cases that the motivating factor behind distinguishing between temporary and permanent damages is the prevention of double recovery for property damage. Cf. Jarrett v. E.L. Harper & Son, Inc., 235 S.E.2d 362, 365 (W. Va. 1977) (where the Supreme Court of West Virginia noted that the fundamental principle regarding damages is that the injured owner is entitled to the amount of compensation that reasonably will make the injured owner whole, and the Court "eliminat[ed] the temporary and permanent classifications" that had

-17-

been previously used to distinguish property damage). In the present case, Hechinger sued 7-Eleven for carrying costs, lost profits, and lost investment income, which were in addition to and distinct from its claim of diminution in land value.

C.

Without permitting double recovery, the Department should have analyzed whether any of the other expenses alleged by Hechinger were proximately caused by the petroleum spill and were properly encompassed by the settlement. We hold, therefore, that because the Department determined without factual analysis that 7-Eleven was not allowed to recover as costs other items that Hechinger alleged as expenses resulting from the property damage, the Department erred as a matter of law in its assessment of the extent of 7-Eleven's liability to Hechinger for property damage.

IV.

For these reasons, we reverse the judgment and remand for reconsideration with instructions to analyze the reasonableness of the settlement, giving due consideration to the property damages for which 7-Eleven was liable to Hechinger.

<u>Reversed and remanded</u>.

Humphreys, J., with whom Bumgardner, J., joins, dissenting.

Because I would find that the circuit court properly applied the substantial evidence standard and the arbitrary and capricious standard in upholding the Department's reimbursement of "costs" to 7-Eleven under the statutes governing the Fund, and because I would find that the Guidelines governing the Fund comply fully with the charge given to the Department by the legislature, I do not join in the analysis or holding of the majority opinion.

## I. Standard of Review

As stated in the majority opinion, issues of "pure statutory interpretation [are] the prerogative of the judiciary." Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996). However, I respectfully disagree with the majority's position that the sole issue here is one of statutory interpretation, permitting this Court to set an "agency action aside even if it is supported by substantial evidence," if the court's review discloses that the agency "failed to comply with a substantive statutory directive," citing Browning-Ferris Indus. of South Atlantic, Inc. v. Residents Involved in Saving the Env't, Inc., 254 Va. 278, 284, 294 S.E.2d 431, 434 (1997). Instead, I would hold that the issue in this case, concerning the propriety of the Department's decision declaring only certain of 7-Eleven's claimed "costs" as "reasonable and necessary" and therefore, eligible for reimbursement from the Fund, is more accurately characterized as a mixed question of law and fact. See Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 243, 369 S.E.2d 1, 7 (1988) (noting that many issues concerning the propriety of agency actions and decisions are "more accurately described as mixed questions of law and fact").

As the majority recognizes,

> findings of fact are to be accorded great deference under the substantial evidence standard of review. However, when deciding whether an agency has followed proper procedures or complied with statutory authority . . ., an inquiry into whether there is

–19–

substantial evidence in the record to support findings of fact of an agency is wholly inappropriate. Indeed, even though an agency's findings of fact may be supported by substantial evidence in the record, it may be subject to reversal because the agency failed to observe required procedures or to comply with statutory authority. See, e.g., Atkinson v. Virginia Alcoholic Beverage Control Commission, 1 Va. App. 172, 336 S.E.2d 527 (1985). Thus, where the legal issues require a determination by the reviewing court whether an agency has, for example, accorded constitutional rights, failed to comply with statutory authority, or failed to observe required procedures, less deference is required and the reviewing courts should not abdicate their judicial function and merely rubber-stamp an agency determination.

Id. at 243, 369 S.E.2d at 7-8. However, the "degree of deference afforded an agency decision depends upon not only the nature of the issue, legal or factual, but also upon whether the issue falls within the area of 'experience and specialized competence of the agency.'" Id. at 243, 369 S.E.2d at 8 (citation omitted).

If the issue falls outside the area generally entrusted to the agency, and is one in which the courts have a special competence, i.e., the common law or constitutional law, there is little reason for the judiciary to defer to an administrative interpretation. Hi-Craft Clothing Co., 660 F.2d [910,] 914-15 [(3d Cir. 1981)] (citing Piper v. Chris Craft Industries, 430 U.S. [1,] 41 n.27 (1977)).

Id. at 243-44, 369 S.E.2d at 8. Conversely, "where the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts." Id. at 244, 369 S.E.2d at 8.

"[']The rationale of the statutory scheme is that the [administrative agency] shall apply expert discretion to matters coming within its cognizance, and judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of the delegated discretion. The reviewing judicial authority may not exercise anew the jurisdiction of the administrative agency and merely substitute its own independent judgment for that of the body entrusted by the Legislature with the administrative function.[']"

Id. (quoting Virginia Alcoholic Beverage Control Commission v. York Street Inn, Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979) (quoting Schmidt v. Board of Adjustment of the City of Newark, 88 A.2d 607, 615-16 (N.J. 1952))).

Thus, it is clear that where the issue to be determined "is a legal issue which falls within the specialized competence of the Commissioner [of an administrative agency] and his [action] involves the proper application of his expert discretion," we do not lightly substitute our judgment for that of the agency specifically created by the legislature to make such determinations, as I believe the majority has done here. Id. at 253-54, 369 S.E.2d at 13; see also Volkswagen of America, Inc. v. Quillian, 39 Va. App. 35, 50, 569 S.E.2d 744, 752 (2002), ("With regard to an agency's decision on legal issues, the standard of review to be applied on appeal depends upon the nature of the legal question involved."), reversed on other grounds sub nom. Volkswagen of America, Inc. v. Smit, 266Va. 444, 587 S.E.2d 526 (2003). Instead, we reverse such decisions, only if they represent an "arbitrary or capricious action," constituting "a clear abuse of delegated discretion." Volkswagen, 39 Va. App. at 50, 569 S.E.2d at 752.

This Court specifically recognized, in Holtzman Oil Corp. v. Commonwealth, 32 Va. App. 532, 529 S.E.2d 333 (2000), that "[t]he [Department] possesses the requisite experience and competence necessary to determine levels of contamination *and the reimbursement due 'owners and operators' for the reasonable costs incurred* for their environmental clean-up efforts," pursuant to Code § 62.1-44.34:11(A)(2)(a). Id. at 539, 529 S.E.2d 333, 337 (emphasis added). I would find that the Department likewise possesses the requisite experience and competence necessary to determine appropriate reimbursement under Code § 62.1-44.34:11(A)(2)(b).

Further, contrary to the implication in the majority opinion, I would find that the statute unambiguously confers upon the Department the *duty* to make such determinations through the

application of its specialized expertise, by independently considering whether the costs associated with a petroleum release are statutorily eligible for reimbursement – regardless of whether the costs are presented standing alone, or as subsumed within a settlement or a judgment.[1]

Consequently, I would find that the Department's decision here, concerning the eligibility of the costs presented by 7-Eleven for reimbursement under the statute, is entitled to deference by a reviewing court and should not be overturned unless found to be arbitrary and capricious and/or unsupported by substantial evidence in the record. See Holtzman, 32 Va. App. at 539, 529 S.E.2d at 337.

Nevertheless, I find it necessary to note that even in according little or no deference to the Department in matters arguably concerning interpretation of the phrase "reasonable and necessary costs," its decision, and that of the trial court in affirming it, must still stand. Indeed, as stated more fully below, the record here simply does not demonstrate that the Department "failed to comply with a substantive statutory directive," or that it improperly limited and/or exercised a "[statutorily delegated function]." See Browning-Ferris, 254 Va. at 284, 294 S.E.2d at 434; Woods v. Commonwealth, 26 Va. App. 450, 458-59, 495 S.E.2d 505, 509 (1998).

## II. Determination of Reasonable and Necessary Costs

In light of the foregoing discussion, I would find that the circuit court properly upheld the Department's analysis of the third-party settlement.

---

[1] In concluding that "no agency expertise is necessary for a resolution of the appeal this issue raises," the majority counter-intuitively suggests that settlement factors such as the "risks of establishing liability and damages" and "complexity, expense and likely duration of the litigation" can be evaluated without the agency applying its expertise and knowledge regarding the effects and remediation of petroleum spills.

As recognized by the majority, the charge given by the legislature to the Department in Code § 62.1-44.34:11(A)(2) is clear. Specifically, that section states, in pertinent part, as follows:

> 2. Disbursements from the Fund *may* be made *only* for the following purposes:
> a. Reasonable and necessary per occurrence costs incurred for releases . . . by the owner or operator who is the responsible person, in taking corrective action for any release of petroleum into the environment from an underground storage tank which are in excess of the per occurrence financial responsibility requirement imposed in subsection B of § 62.1-44.34:12, up to one million dollars.
> b. Reasonable and necessary per occurrence costs incurred for releases . . . by the owner or operator who is the responsible person for compensating third parties, including payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank, which are in excess of the per occurrence financial responsibility requirement imposed by subsection B of § 62.1-44.34:12, up to one million dollars. Disbursements for third party claims shall be subordinate to disbursements for the corrective action costs in subdivision A 2 a of this section.

Code § 62.1-44.34:11(A)(2) (emphases added).

7-Eleven and the majority read this statute to "require" the Department, as a matter of law, to consider a settlement, by default, as a "baseline" figure in determining reimbursable third party costs for a petroleum release. Thus, the majority declares that such settlements must be reviewed only as a whole, in considering whether it represents a "reasonable and necessary" "cost" eligible for reimbursement from the Fund. I would find no such requirement. Instead, the statute requires the Department to do no more than it did here. Specifically, to look beyond any settlement or judgment to consider, through the lens of their specialized expertise: the actual evidence of "costs" presented to the Department; their nexus, if any, to a petroleum spill; and their eligibility for reimbursement from the Fund.

In support of this position, I note that the plain language of the statute requires only that the Department administer Fund reimbursements according to the clear legislative charge given

-23-

to the Department. That charge is that the Department "may" reimburse appropriate parties "only" for the purposes listed therein. See Code § 62.1-44.34:11(A)(2)(b). Thus, it is the duty of the Department to reimburse such parties only for costs it deems, in its expert opinion, to be "reasonable and necessary," and otherwise eligible for reimbursement under the statute.

While I agree that the "wording of [subsection (A)(2)(b)] leaves no doubt that the legislature envisioned legal actions being brought against owners for petroleum spills and that the legislature intended that the monetary result of those legal actions for property damage, including those cases resulting in settlements," constitute "costs" that the Department has the authority to consider in determining reimbursement, I do not agree with the majority that the Department is "required" to consider the "reasonableness of the settlement" as a separate and distinct element of its inquiry. Rather, the statute very clearly entrusts the Department with the authority, and the duty, to look behind the settlement amount, to determine if the individual costs making up the settlement reflect "reasonable and necessary per occurrence costs" which are otherwise eligible for reimbursement under the statute.

As the majority recognizes, the statute grants the Department the *authority* to consider a judgment (for bodily injury or property damage) as a separate and distinct element of its inquiry.[2] However, a judgment is quite different from a settlement. Specifically, a judgment

---

[2] The majority holds that "the judgment amount certainly would have established the base-line for the computation of 7-Eleven's reasonable and necessary costs for purposes of Code § 62.1-44.34:11(A)(2)(b), subject only to the statutory limitation. A plain reading of the statute permits no other conclusion." I note here that this fallacious premise ignores the requirement that the Department consider only those individualized "costs" that, in the specialized expertise of the Department, have a causation nexus to the petroleum release and which are not otherwise statutorily ineligible. For example, the statute clearly allows reimbursement "*only*" for "*reasonable and necessary* per occurrence costs incurred . . . by the owner or operator *who is the responsible person* for compensating third parties, including payment of judgments *for bodily injury or property damage caused by the release of petroleum* . . . ." Code § 62.1-44.34:11(A)(2)(b) (emphases added); see also Code § 62.1-44.34:11(A)(3) – (10) (stating that "[n]o funds shall be paid" for certain costs, including certain specified "reimbursement" costs).

–24–

reflects a determination of damages reached, in the context of an adversary proceeding, by a

disinterested party other than the Department - namely, a judge or jury. A settlement, on the

other hand, reflects merely an agreement between interested parties. Although, as the majority

correctly recognizes, "'[t]he law favors compromise and settlement of disputed claims,'"

Snyder-Falkinham v. Stockburger, 249 Va. 376, 381, 457 S.E.2d 36, 39 (1995) (citation

omitted), it is axiomatic that a settlement reflects costs which the parties themselves deem

"reasonable and necessary" - costs which may, or may not, be considered "reasonable and

necessary" by the Department in its expert discretion, or by a judge or jury in the context of an

adversarial proceeding.[3]

The majority holds today that the Department must presume settlements to be

"reasonable and necessary" and, if not clearly unreasonable or excessive, must reimburse such

costs subject only to the statutory cap.[4] I simply do not agree. As stated above, the statutes

---

[3] Indeed, the regulations governing the Fund, enacted in 1990, after 7-Eleven settled the litigation, support the import of this distinction. In particular, in setting forth the manner in which compensation from the Fund may be paid directly to third parties, the regulations state:

> 2. Compensation for bodily injury and property damage shall be paid to third parties *only* (i) in accordance with final court orders in cases which have been tried to final judgment no longer subject to appeal, (ii) in accordance with final arbitration awards not subject to appeal, *or* (iii) *where the board approved the settlement of claim between the owner or operator and the third party prior to execution by the parties.*
> The Commonwealth has not waived its sovereign immunity and does not believe that it is a necessary party to a private action against an owner or operator for third party bodily injury and property damage.

9 VAC 25-590-210(A)(2) (emphases added).

[4] The majority concludes, at least implicitly, that the settlement here was "reasonable" because "[n]either the Department in its fact finding nor the trial judge on review determined the $575,000 was an unreasonable amount to settle the pending property damage litigation . . . ." However, the record here is largely devoid of evidence concerning several of the factors the majority posits should be considered in assessing the reasonableness of settlement. Specifically,

-25-

governing the Tank Fund, clearly charge the Department with, not only the authority and discretion, but the duty to consider all evidence of per occurrence costs, including those which may be subsumed within a settlement. The Department must then determine whether such "costs" are "reasonable and necessary" and are otherwise statutorily eligible for reimbursement from the Fund, before granting a reimbursement request. In light of this, the statute simply does not "require" the Department to consider settlements as a whole, or by any other specific method, and certainly does not preclude the Department from looking behind the settlement figure for the purposes of considering the individual costs supporting it, as was done here.

Finally, I do not agree, as the majority states, that "the Department's interpretation of the statute . . . preclud[ed] recovery of settlement costs" in this case. To the contrary, in its decision, the Department specifically considered 7-Eleven's claim that it should review the matter in terms of "whether the settlement amount fell within an 'appropriate settlement range' rather than a precise dollar amount that is deemed reasonable." After reviewing all the evidence, including the amount originally sought by Hechinger in its Amended Motion for Judgment, as well as the ultimate settlement amount and several detailed damage estimates submitted by 7-Eleven, the Department chose to value the "reasonable and necessary" costs in terms of the amount *it* deemed "reasonable and necessary," rather than the amount the *parties* deemed "reasonable and necessary" by way of their settlement. Nothing in the statute precludes the Department, in its expert discretion, from independently analyzing "reasonable and necessary" costs in this manner.

Thus, because I would find that the statute clearly provides the Department with the authority, the discretion, and the duty to determine the reasonableness and necessity of all

---

the "range of reasonableness of the settlement in light of all the attendant risks of litigation," the "complexity, expense, and likely duration of the litigation," the "recommendations of competent counsel," and "the reaction of the [beneficiaries] to the settlement." Dauphin Deposit Bank & Trust Co. v. Hess, 727 A.2d 1076, 1078 (Pa. 1999).

recoverable costs, and does not mandate any specific considerations beyond those plainly set forth in the statute, I cannot join the majority in its amendment of the statute by judicial fiat. Instead, I would uphold the circuit court's determination, affirming the Department's decision.

### III.  Tank Fund Guidelines

I would also find that the Fund's Guidelines comply fully with the charge given the Department by the legislature, and do not "impermissibly restrict recovery [for] property damage."  Moreover, I disagree that the Department impermissibly "restrict[ed] recovery of property damage to only those specifically listed in the Guidelines."

As the majority notes, the Guidelines provide as follows, in Section VI(C):

> Costs incurred by owners/operators, in compensating third parties for real property damage proximately caused by a release from an owner's/operator's eligible tank, which are eligible for disbursement from the Fund *include* the following:
> 1.  For temporary damage to real property, the decrease in rental value during the continuance of the injury, and
> 2.  For permanent damage to real property, the lower of (i) the diminution in the value of the real property and fixtures (as determined after completion of corrective action) or (ii) the cost to restore the real property to its condition prior to the injury.

Guidelines VI(C) (emphasis added).

By the majority's own reasoning, these "Guidelines" do not restrict "recovery of property damages to only those specifically listed."  Indeed, the Guidelines state that costs incurred that are eligible for reimbursement "*include*" the items listed.  Thus, as stated by the majority and as the plain meaning of the word suggests, the Department "indicated that the specifically mentioned [costs] are not exclusive," Herb's Welding, Inc. v. Gray, 470 U.S. 414, 423 n.9 (1985), and therefore, do not restrict "recovery of property damages to only those specifically listed in the Guidelines."

Indeed, Section VII of the Guidelines sets forth costs which the legislature and the Department, in its expert discretion and according to its interpretation of its statutory charge,

have deemed ineligible third party liability costs.  There would be no need for the Department to identify such "ineligible" costs if Section VI, or any other provision in the Guidelines, limited reimbursement to only those specifically listed in the Guidelines.

Further, the fact that the Guidelines do not designate as eligible any and all costs incurred, does not conflict with the charge given to the Department by the legislature.  In fact, as stated above, the statute does not entitle a claimant to a recovery for any and all costs incurred in the form of damages, nor does it provide the Department with the discretion to reimburse for any and all costs incurred.  Instead, the legislature limited reimbursable costs to those that the Department, in its discretion, finds "reasonable and necessary," *and* to those not otherwise declared ineligible under the statute.  Code § 62.1-44.34:11.

Lastly, it is clear that in reaching its determination in this case, the Department correctly applied the Guidelines, explicitly stating that it considered the costs claimed and whether those costs were "eligible pursuant to the Guidelines."

Thus, because I would find that the Guidelines do not bar the Department's exercise of discretion (beyond the limitations otherwise set forth in the statute) in determining the recoverability of property damage, and because I would find that the Department correctly applied the Guidelines, I would hold that the circuit court did not err in applying the arbitrary and capricious standard in upholding the Department's decision.

### IV.  Temporary Damages

Finally, I disagree with the majority's conclusion that the hearing officer and the circuit court disregarded 7-Eleven's claim for the carrying costs, lost profits, and lost investment income as encompassed within the settlement.

On appeal, 7-Eleven contends that the Department "and the circuit court erred as a matter of law in denying 7-Eleven's recovery of temporary and permanent damages proximately caused

by the contamination." However, the record clearly demonstrates that the hearing officer specifically reviewed all costs claimed by 7-Eleven, including "additional expenses resulting from carrying property on the books; and . . . interest, costs and attorney's fees (of Hechinger)," and explicitly considered whether 7-Eleven was entitled to reimbursement for "permanent, temporary, or both types of damages." Based upon his review of all the evidence, including the damages characterized by 7-Eleven on appeal as "permanent" and "temporary," the hearing officer determined that, because 7-Eleven presented no evidence that the contamination would "attenuate within a known time frame," the appropriate measure of damages would be "the permanent diminution in the value of the property," to be valued as set forth in Packett v. Herbert, 237 Va. 422, 377 S.E.2d 438 (1989). The hearing officer did not conclude, as suggested by the majority, that under Packett he could not award reimbursement for both permanent and temporary damages. Nor did the hearing officer conclude that he could not award reimbursement for both permanent property damage, in terms of diminution in land value, and "intangible property damage costs." Instead, the hearing officer clearly considered all of the evidence pertaining to damages, however characterized by 7-Eleven, and made a determination that only certain of those costs were eligible for reimbursement pursuant to the statute and the Guidelines.

While I have no doubt that the hearing officer's decision could have been more detailed, I am of the opinion that his determination, which was based upon the application of the hearing officer's expert discretion, as an agent of the Department, fell within his specialized competence, and that of the Department. Neither this Court, nor the circuit court should substitute its own independent judgment for that of the Department, as the majority seems to have done here. Instead, we may only reverse the Department decision if it was arbitrary and capricious and without substantial evidence to support it. See Holtzman, 32 Va. App. at 538-39, 529 S.E.2d at

337. Because I would find substantial credible evidence supporting the hearing officer's determinations, and because there is no indication in the record that the hearing officer's determinations on these issues were arbitrary and capricious, I would find no error in the circuit court's decision to uphold the hearing officer's judgment.

For the foregoing reasons, I dissent and would affirm the decision of the circuit court, upholding the award of the Department of Environmental Quality.

Annunziata, J., dissenting.

I respectfully dissent from the majority opinion. 7-Eleven claims on appeal that the trial court applied the wrong standard of review and that it erroneously affirmed the Department of Environmental Quality's damages analysis. 7-Eleven specifically claims that the Department erroneously: 1) failed to award reimbursement for temporary damages, including lost rental income, carrying costs, lost profits, and lost investment income; 2) failed to properly consider the opinions of qualified experts; 3) failed to apply the "common law factors traditionally used to evaluate the reasonableness and necessity of a settlement", and 4) erroneously conducted a "de novo examination of the evidence" to determine whether its settlement was reasonable and necessary. The claims that 7-Eleven raises involve issues of law and fact and implicate different standards of review on appeal. For the reasons that follow, I would affirm the trial court's judgment in this case.

## I. Background

The record makes clear that the Department considered the settlement reached between 7-Eleven and Hechinger, but that it rejected the figure proffered, finding it to be an inaccurate reflection of the reasonable and necessary costs incurred as a result of injury to Hechinger's property. The injury in question was caused by leakage from an underground petroleum tank located on 7-Eleven's property. The Department rejected the settlement figure on two grounds. First, it rejected the settlement amount as neither "reasonable [nor] necessary" because it found the law and the evidence failed to support certain elements of the claim. Second, the Department rejected 7-Eleven's contention that it was required to determine the reasonableness and necessity of the settlement amount by considering "the appropriate settlement range" found in similar, litigated claims and that the Department was, therefore, precluded from considering, *de novo*, whether the underlying evidence supported 7-Eleven's claim for reimbursement.

## II. Standard of Review

Although decisions by administrative agencies regarding matters within their specialized competence are "entitled to special weight in the courts," Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 244, 369 S.E.2d 1, 8 (1988), "when, as here, the question involves an issue of statutory interpretation, 'little deference is required to be accorded the agency decision' because the issue falls outside the agency's specialized competence." Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996) (quoting Kenley, 6 Va. App. at 246, 369 S.E.2d at 9). "In sum, pure statutory interpretation is the prerogative of the judiciary." Id. In the case before the Court, the Department's interpretation of Code § 62.1-44.34:11(A)(2), and its determination that certain damages are not recoverable as a matter of law, must, therefore, be reviewed in accordance with the least deferential standard of review. Id. The Department's factual determinations, however, are entitled to great deference. Holtzman Oil Corp. v. Commonwealth, 32 Va. App. 532, 539, 529 S.E.2d 333, 337 (2000) ("Where the issue is whether there is substantial evidence to support findings of fact, great deference is to be accorded the agency decision.").

### III. The Trial Court Did Not Err in Affirming the Agency's Damages Analysis

7-Eleven contends that the trial judge erred in affirming the Department's damage analysis under which it rejected its claim for both permanent and temporary damages, including lost rental income and various carrying costs. In support of its contentions, 7-Eleven relies on the general principle enunciated in Lochaven Co. v. Masters Pools by Schertle, Inc., 233 Va. 537, 337 S.E.2d 534 (1988) that "[t]he measure of damages in a negligence action is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct." Id. at 541, 357 S.E.2d at 537. The general principle, albeit applicable, does not necessarily support the conclusion that the particular damages sought are recoverable in their

entirety. Numerous, specific principles of law defining appropriate damages in cases involving tortious injury to real property have equal, if not greater, relevance to this Court's resolution of the question. The Department properly accepted these specific principles of law in determining the reasonable costs incurred by 7-Eleven in settling its litigation with Hechinger.

A. The Department Did Not Use An Improper Measure of Damages

Two concerns animated the Department's consideration of 7-Eleven's request for reimbursement of its costs in this case: the avoidance of double recovery and the application of relevant law governing recovery of damages for injury to real property. To determine whether 7-Eleven's claimed damages were reasonable and necessary, the Department discussed and applied the following principles.

The measure of damages for permanent injury to property is the diminution in the market value of the property, viz., the difference between the market value of the property before and after the injury. The Department cited four Virginia cases in support of that proposition: Packett v. Herbert, 237 Va. 422, 377 S.E.2d 438 (1989); Douthat v. Chesapeake & Ohio Ry. Co., 182 Va. 811, 30 S.E.2d 578 (1944); Norfolk & Western Ry. Co. v. Richmond Cedar Works, 160 Va. 790, 170 S.E. 5 (1933); and Raleigh Court Corp. v. Faucett, 140 Va. 126, 124 S.E. 433 (1924). When damages to real property are deemed to be permanent, temporary damages, including lost rental income, are not recoverable. For this proposition, the Department relied on the holding in Georgia v. City of East Ridge, Tenn., 949 F. Supp. 1571 (N.D. Ga. 1996).[5] Equally relevant to whether both temporary and permanent damages for injuries to real property are recoverable is the proposition that where temporary damages, such as cost of repair, exceed the diminution of market value, damages are limited to the diminution of market value. The Department cited

_____

[5] I note that the Virginia Supreme Court case, Packett v. Herbert, also stands for this proposition.

United States Steel Corp. v. Benefield, 352 So.2d 892 (Fla. Dist. Ct. App. 1977), in support of this proposition. It also cited the Virginia Supreme Court case, Averett v. Shircliff, 218 Va. 202, 237 S.E.2d 92 (1977), as authority for an analogous principle which it expected to apply in addressing evidence which established that the contamination to the Hechinger property had been "partially cured." That principle states that, where evidence of repair and depreciated value after repairs exists, the proper measure of damages is the *lower* of 1) the difference in the fair market value of the property before and after the accident, or 2) if the property could be restored to its former condition, the cost of repairs, plus applicable depreciation. Averett, 218 Va. at 207-08, 237 S.E.2d at 95-96. Finally, to address evidence in the case which showed that factors other than contamination were relevant to determining the post-injury value of the subject property, the Department cited the Virginia Supreme Court case of Techdyn Sys. Corp. v. Whittaker Corp., 245 Va. 291, 427 S.E.2d 334 (1993), for the proposition that "where there is evidence of damage from several causes, for a portion of which a defendant cannot be held liable, a plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible." Id. at 296, 427 S.E.2d at 337.

Applying the least deferential standard of review articulated in Sims Wholesale to the Department's conclusions of law, I would find no error in its reliance on the legal principles it cited. Other authorities cite the same principles as governing. Thompson on Real Property, for example, sets forth the following:

> When a plaintiff recovers permanent damages for harm to
> property, those damages are measured by depreciation in the
> market value of the property. Those damages are measured by
> whatever depreciation in the market value of the property has been
> caused by the nuisance. Loss of rental value may be the
> appropriate measure of damages, if the property itself is not
> harmed but its usefulness has been impaired. A plaintiff may not
> recover permanent damages for both the loss of market value and
> loss of rental value. If temporary damages are recovered for harm
> to property, those damages are measured by the loss of the rental

value or loss of use value of the property as a result of or during the continuance of the nuisance.

8 Thompson on Real Property § 67.06(a)(2), at 119-20 (David A. Thomas ed. 1994) (footnotes omitted); see also 9 Powell on Real Property § 64.07[3], at 64-42 (Michael Allan Wolf ed., Matthew Bender) ("When the harm caused by a nuisance is only temporary and can be abated, the measure of damages normally is the depreciation in the rental or use value of the affected property . . . .   When harm is permanent, damages are measured by the decrease in the fair market value of the property." (footnotes omitted)); 1 Dan B. Dobbs, The Law Of Torts § 57, at 113 (2001) ("Courts are generally reluctant to approve recovery for repairs or restoration when costs exceed the amount by which the land's value has been diminished."); Id. at 115 ("If the defendant's nuisance or trespass continues to cause harm to the plaintiff's interests in land, courts usually begin by classifying the invasion as either permanent (completed) or temporary and continuing. . . .   The permanent . . . damages measure is usually the diminished value of the land resulting from the invasion" (footnotes omitted)); 1 Dan B. Dobbs, Law of Remedies § 5.1, at 711 (2d. ed. 1993) ("Quite commonly, . . . in the case of physical harms to the property itself, the measure is the diminished value of the land caused by the trespass" (footnote omitted)); Id. § 5.6(1), at 754 ("If the effects of the nuisance are more or less permanent, the diminution in land value due to the nuisance will be recoverable; if temporary, the diminished rental value during the period of harm."); see also Walker Drug Co. v. La Sal Oil Co., 972 P.2d 1238, 1246 (Utah 1998).

Recovery for both permanent and temporary damages in cases involving real property injuries is generally excluded on the ground that the recovery is duplicative.  Patrick v. Sharon Steel Corp., 549 F. Supp. 1259, 1265 (N.D. W. Va. 1982) ("the motivating factor behind distinguishing between temporary and permanent damages [is] the prevention of a double recovery for permanent damages"); 58 Am. Jur. 2d Nuisances § 276.  Generally, diminution in

value of the property constitutes the upper limit of recovery. When permanent damages are awarded or temporary damages exceed the value of the property, temporary damages are not appropriate because an award for both would constitute a duplicative recovery. See Beam v. Birmingham Slag Co., 10 So.2d 162, 164 (Ala. 1942); 58 Am. Jur. 2d Nuisances § 276; see also Averett, 218 Va. at 207-08, 237 S.E.2d at 95-96.[6]

In my view, 7-Eleven's claim that the Department erroneously denied recovery for both permanent damages and temporary damages, such as rental income and carrying costs, is not supported by the law of damages as set forth in Virginia law and in our sister states. 7-Eleven presents no argument to refute the validity of the principles governing the measure of damages for permanent injuries to real property, save the general principle of law set forth in Lochaven which allows recovery of all proximately caused damages. That general principle, however, does not nullify or subordinate the specific principles upon which the Department relied in determining whether the reimbursement 7-Eleven sought was reasonable and necessary. I would, therefore, hold that the Department applied the correct legal principles to its damages analysis and that the trial court properly affirmed that decision.

B. The Department's Findings of Fact in Determining 7-Eleven's Reasonable Costs Are Supported by Substantial Evidence

Having determined the applicable legal principles, the Department evaluated the evidence presented in support of 7-Eleven's claim in light of those principles. This analysis was fact-based and resulted in factual findings that are entitled to deference by the reviewing court. Holtzman, 32 Va. App. at 539, 529 S.E.2d at 337. The trial court may not substitute its own independent judgment for that of the agency and will only reverse an agency's factual findings if not supported by substantial evidence. Volkswagen of Am., Inc. v. Quillian, 39 Va. App. 35, 49,

---

[6] The Department did not cite Averett for this proposition, but the case appears to imply it.

569 S.E.2d 744, 751 (2002), rev'd on other grounds sub nom., Volkswagon of America, Inc., v. Smith, 266 Va. 444 , 587 S.E.2d 526 (2003). I would find that the trial court did not err in affirming the decision of the Department because it is supported by substantial evidence.

The record discloses that the Department reviewed the settlement figure proffered by 7-Eleven and the evidence supporting it. Based on this review, the Department found that the reimbursement 7-Eleven sought was not reasonable and necessary, and it set the award at $103,117. In reaching this conclusion, the Department first found, as fact, that the injury to the Hechinger property attributable to the leakage of petroleum from an underground tank located on 7-Eleven's property was permanent in nature. Its conclusion was based on the following evidence:

> Upon site closure, contamination remained on the Hechinger property. The Regional Office's July 7, 2000 memorandum indicates that it is simply not possible to predict how long it will take natural attention [sic] to return the site to background levels. Southland provided no evidence and no evidence exists in the Agency's records that indicates the remaining contamination will attenuate within a known time frame.

The conclusion that the injuries to the Hechinger property were permanent in nature is supported in the record. Indeed, that finding is undisputed. The Department's conclusion is also consistent with the definitions of permanent and temporary injuries. "Whether contamination by toxic waste is a permanent or continuing injury turns on the nature and extent of the contamination; the crucial test of the permanency of a trespass is whether the trespass can be discontinued or abated." Mangini v. Aerojet-General Corp., 912 P.2d 1220, 1226 (Cal. 1996) (citations and quotations omitted).

Turning then to the task of determining the reasonable and necessary cost for the permanent damage to Hechinger's property, the Department applied the formula set forth in Faucett, Douthat, and Richmond Cedar Works. The formula is based on the difference between

the fair market value of the property before and after the injury. See 22 Am. Jur. 2d Damages §
405.

The Department determined that the property's fair market pre-injury value was between
$903,177 and $938,700. Its finding was based on evidence of the County assessment of the
property and the actual price Hechinger paid for the property two years before the pollution
report. It specifically rejected Hechinger's 1990 asking price of $1,550,000 for the property as
an accurate pre-injury value, finding that it was forty percent higher than the price Hechinger
paid for the property less than two years earlier and significantly inflated. For similar reasons it
rejected the opinion offered by one of Hechinger's experts, Lawrence A. Salzman, who stated
the pre-injury value to be $1,300,000. 7-Eleven's expert, Joseph B. Call, III, opined that the
property's pre-injury value was $715,000, a figure substantially below that which the
Department considered fairly derived. In short, the Department gave more weight and credence
to evidence of the property's assessed value and evidence of its purchase price two years before
the contamination occurred in reaching its conclusion that the fair market value of Hechinger's
property pre-injury was $903,117. I cannot say that this finding is not supported by substantial
evidence. Quillian, 39 Va. App. at 49-50, 569 S.E.2d at 751-52 ("'The reviewing court may
reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind
necessarily would come to a different conclusion.'" (quoting Kenley, 6 Va. App. at 242, 369
S.E.2d at 7)); see also Jules Hairstylists, Inc. v. Galanes, 1 Va. App. 64, 69, 334 S.E.2d 592, 595
(1985) ("We do not retry the facts before the [agency], nor do we review the weight,
preponderance of the evidence, or the credibility of witnesses. If there is evidence or a
reasonable inference that can be drawn from the evidence to support the [agency's] finding, they
will not be disturbed by this court on appeal.").

To calculate the property's diminution in value the Department also had to determine the property's post-injury fair market value. In doing so, the Department considered the opinions proffered by Hechinger's and 7-Eleven's experts as well as a post-injury offer to purchase the land for $800,000. It rejected the former and credited the latter. It explained its decision to credit the offer of purchase as an accurate measure of the property's fair market post-injury value, noting that use of the post-injury offer to purchase was made by a potential purchaser of the site in July 1996, after the "majority of the cleanup expenses already had been incurred." It concluded:

> It is not unreasonable to assume that the buyer was aware of the condition of the parcel and that the current condition was reflected in the offer price. Because the bulk of the cleanup had occurred at that point, using this figure in the diminution of property value calculation would not result in a double recovery to Southland.

The Department made its award of $103,117 by calculating the difference between $903,117 and $800,000. Its reasoning follows:

> Based on the valuation information provided, a reasonable range for the permanent damages was between $138,700 and 103,117 (i.e., $938,700 or $903,117 minus $800,000). It is not necessary to make an adjustment to reflect partial cure costs, because the $800,000 offer appeared to be from an arms-length buyer and was made at a time when the cure of the property was nearly complete. Additionally, the evidence does not clearly demonstrate that topographical problems at the site affected the offer price. Therefore, the claimant will be given the benefit of the doubt on this issue, and no adjustment will be required to address this alleged cause of reduced property value. For the foregoing reasons, third party claim costs in the amount of $103,117 are approved, as this amount reflects actual market values.

I cannot say that substantial evidence does not support the Department's determinations of the property's value before and after the injury. As such, the Department's conclusions were properly affirmed by the trial court.

In my view, 7-Eleven's contention that the Department erred in rejecting the opinions of post-injury value proffered by 7-Eleven's and Hechinger's experts is without merit, and I would affirm the trial court's decision to affirm the Department's rulings on this issue.

7–Eleven raises three points to support its argument on this issue. It contends that because the experts were "qualified and employed accepted methodologies" in formulating their opinions, the Department's decision was arbitrary and capricious. This argument overlooks the standard of review that governs fact-based determinations by the Department. Quillian, 39 Va. App. at 49, 569 S.E.2d at 751 ("'The sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency's decision.'" (quoting Kenley, 6 Va. App. at 242, 369 S.E.2d at 7)). It also fails to consider that the Department rejected the experts' opinions because their underlying premises, in part, were not consistent with the law of damages which the Department concluded applied.

As noted above, the Department found the *pre-injury* valuations given by 7-Eleven's experts were not "credible" in light of the "County's assessment of the property and the amount Hechinger actually paid for the property less than two years before the contamination was discovered." This finding of fact establishing the property's pre-injury value is supported by substantial evidence and may not be rejected unless "'considering the record as a whole, a reasonable mind necessarily would come to a different conclusion.'" Id. at 50, 569 S.E.2d at 751-52 (quoting Kenley, 6 Va. App. at 242, 369 S.E.2d at 7).

The Department's rejection of the experts' appraisals of *post-injury* fair market valuations was based on both findings of fact and the application of law. The record supports the Department's conclusions.

The record discloses that Salzman provided two evaluations. He first established a market value for the property in the amount of $1,300.000. That figure did not take the

property's contamination into account, and was properly rejected by the Department as not relevant to its determination of post-injury damages. In subsequently addressing the value of the property post-contamination, Salzman used an analysis based on estimates of Hechinger's lost investment income, lost rental income, carrying costs, including tax payments and expenses for legal assistance and environmental experts. These elements of temporary damages and an analysis based on them do not comport with the legal measure of damages enunciated by numerous authorities which require a comparison of property's fair market value before and after injury. See supra Part III.A; see also Packett, 237 Va. 422, 377 S.E.2d 438; Douthat, 182 Va. 811, 30 S.E.2d 578; Richmond Cedar Works, 160 Va. 790, 170 S.E. 5; Faucett, 140 Va. 126, 124 S.E. 433; 5 C. M.J., Damages, § 34 (2003) ("The general rule is that the proper measure of damages for injury of a permanent nature to real estate is the difference between its market value immediately before the injury and its market value immediately after the injury." (footnote omitted)). Indeed, there is no authority to support the inclusion of the factors Salzman considered in determining the post-injury fair market value of real property.

The record discloses that Call's opinion was likewise segmented into two. In his report, Call opined that the post-injury market value of the property was $715,000. That figure also failed to take into account the property's contamination and its effect on market value; Call found that the contamination was not relevant to determining the property's value. Instead, he found that the property's market value was adversely impacted by the site's severe topographical constraints. Call's opinion thus did not reflect the diminution in value suffered by the property pre- and post-injury as a result of the contamination. As such, his opinion was properly rejected by the Department. Subsequently, Call was asked to render an opinion on the market value of the property in light of the contamination. In his response, he confined his analysis to that portion of the site that was contaminated, an area of about one acre, or approximately one-tenth

of the entire parcel. He concluded that the present value of the damages to that particular portion of the site was $102,000. He based his estimate of damages on the conclusion that this one acre portion of the site "could not be employed for its highest and best use in 1990" and calculated the loss as total. The Department properly rejected Call's opinion to determine damages because his initial opinion did not consider the contamination of the site, and his second opinion did not address the entire site, with all its attendant problems, both topographical and toxic.

7-Eleven argues that Call's second figure, $102,000, nonetheless represents the diminution of market value of the property before and after injury. The record fails to support that conclusion, factually or logically, because it presumes that the total site's fair market value post-injury can be equated with the diminution in value of one segment of that property. Indeed, Call's own opinion belies the conclusion: his first estimate of post-injury fair market value took into consideration the entire tract of land, including the contaminated portion, and he found that the site's value was not diminished by the portion contaminated.[7]

Finally, the Department rejected the appraisal given by Hechinger's expert, Salzman, because it also "assumed no contamination was present on the property and appeared to conclude that the substantially lower property value was due to [severe] topographical problems."

In summary, the Department concluded that the opinions proffered by 7-Eleven's and Hechinger's experts either failed to provide a fair market value of the property with the contamination factored in, or provided estimates of fair market value based on improper considerations. In my view, the trial court did not err in affirming the Department's exclusion of the experts' opinions in evaluating 7-Eleven's claim for reimbursement under the Fund.

---

[7] In any event, Call's opinion of damages was not substantially different from the figure the Department ultimately determined was reasonable and necessary. Even assuming that the Department erred in disregarding it, the error was harmless. Freeman v. Commonwealth, 223 Va. 301, 316, 288 S.E.2d 461, 469 (1982).

I would also affirm the trial court's decision finding that the Department did not err in excluding recovery for temporary damages, including lost rental income, and carrying costs, such as lost investment income, taxes, and insurance costs. The Department's decision was consistent with settled principles that recovery for both permanent and temporary damages are not recoverable. See supra Part III.A. The Department's decision was also consistent with the legal principle that when temporary damages exceed permanent damages, only the latter are recoverable.[8] See 8 Thompson on Real Property, supra, § 67.06(a)(2), at 119-20; Beam, 10 So.2d at 164; 58 Am. Jur. 2d Nuisances § 276; see also Averett, 218 Va. at 207-08, 237 S.E.2d at 95-96 (by implication).

In addition to rejecting the claims for temporary damages as not consistent with the principles regarding the proper measure of damages, the Department also declined to award temporary damages based on certain factual findings that it made. For example, it rejected evidence that Hechinger had lost rental income in the amount of approximately $719,000. That evidence was presented by Hechinger's expert, Lawrence Salzman. He applied a formula using the pre-injury value he gave to the site in the amount of $1,300,000 to determine the rental income the site could have generated. The pre-injury value of $1,300,000 was properly rejected by the Department as unreliable because it failed to take contamination into account. It follows that his estimate of lost rental income is equally unreliable and was properly rejected by the Department.

---

[8] Here, the estimate of lost rental income was in the amount of $710,000 (increasing at more than $140,000 per year). The estimate of lost investment income was $550,000 (increasing at about $32,000 per year). The total carrying costs were estimated to be $283,000 (increasing at a rate of about $37,000 per year). These estimated temporary losses, both separately and in the aggregate, exceeded the permanent diminution in fair market value of the property, which the Department found to be $103,111.

The Department further determined, as a matter of fact, that the evidentiary premise underlying the claim for temporary damages such as carrying costs, lost profits, lost investment income, and lost rental income was wanting.  That premise rested on Salzman's opinion that Hechinger could not sell the property in 1990 because of its contaminated state and that it therefore incurred such temporary damages.  The opinion was thus based on the assumption that, had the property not been contaminated, a sale of the property would have been realized.  The Department found, however, that Hechinger's failure to sell the property was due to Hechinger's asking price for the property, which it determined was inflated considering other evidence of value in the case.[9]  The Department's factual determinations of the reasons behind the property's failure to sell are entitled to deference and must be affirmed when supported by the evidence.

In conclusion, I would find that the Department properly considered and then rejected the settlement reached by 7-Eleven and Hechinger as conclusive evidence of "reasonable and necessary" costs because, as a matter of law, Hechinger was not entitled to some of the damages it claimed and, as a matter of evidence, proof of certain elements of the claim was wanting.  I would, therefore, find that the trial court did not err in affirming the Department's application of law regarding the proper measure of damages in this case and its determination, based on the evidence and the relevant legal principles, that $103,117 constituted the reasonable and necessary costs 7-Eleven had incurred as a result of the contamination sustained by the Hechinger property.

---

[9] Even if 7-Eleven's carrying costs, lost profits, lost investment income, and lost rental income can be construed as consequential damages, see 2 Dobbs, The Law of Torts, supra, § 379, at 1056, the evidence fails to prove the amounts with reasonable certainty and fails to prove that the additional damages claimed were the proximate result of the tort.  Id.

IV. The Agency Was Not Required to Apply Common Law Factors And Did Not
Err In Conducting An Independent Review of the Evidence To Determine Whether 7-Eleven's
Settlement Was Reasonable and Necessary

7-Eleven's final argument in support of its claim that the Department erred in its damage

analysis is premised on a claim that the Department failed to apply traditional common law

principles governing the evaluation of settlements and that, as a result, it erred in conducting an

independent, *de novo* review of the evidence underlying its claim. I would find no error in the

Department's rejection of these contentions and the trial court's affirmance of that decision

because, in my view, Code § 62.1-44.34:11(A)(2) does not permit the review 7-Eleven urges.[10]

The Code is silent on the question of whether the agency is required to determine the

settlement's reasonableness and necessity by applying common law factors of evaluation and by

not reviewing the underlying evidence in support of the claim. The sole reference to

"settlement" is found in Section VIII of the Fund Guidelines, promulgated by the DEQ in 1998,

after the institution of this action but before the Department decided the case. The reference is

general in import and, like the statute, lacks definition of the factors to be considered. The

Guidelines are explicit about one aspect of the Department's review, however: they clearly put

claimants on notice that the Department will not necessarily make reimbursements reflecting the

full settlement amount.

The statutory silence regarding whether the Department must apply a traditional common

law analysis to determine the reasonableness and necessity of a settlement and that it not

consider the underlying evidence in support of the claim, gives rise to an ambiguity that is

---

[10] Even were the factors used to review the reasonableness of settlement to be applied here to determine the reimbursement due 7-Eleven under Code § 62.1-44.34:11(A)(2), an evaluation of what damages were recoverable would generally have to be made. See, e.g., Dauphin Deposit Bank and Trust Co. v. Hess, 727 A.2d 1076, 1078 (Pa. 1999). As discussed in the previous section, 7-Eleven's claim that the settlement figure represented "reasonable and necessary" costs was not supported by the evidence establishing the damages it could have recovered in litigation.

subject to interpretation by the parties, the Department, and, ultimately, by the court. <u>Virginia</u>

<u>Dep't of Labor & Industry v. Westmoreland Coal Co.</u>, 233 Va. 97, 101, 353 S.E.2d 758, 762

(1987). A statute is open to construction only where the language used requires interpretation

because of ambiguity which renders it susceptible of two or more constructions or such doubtful

or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning.

<u>Brown v. Lukhard</u>, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985); <u>cf.</u> <u>Winston v. Richmond</u>, 196

Va. 403, 408, 83 S.E.2d 728, 731 (1954) (noting "that which is plain needs no interpretation").

### A. The Language of Code § 62.1-44.34:11(A)(2) Does Not Support 7-Eleven's Interpretation By Implication

The principles of law that govern statutory construction are well settled. <u>See, e.g.,</u> <u>Grillo</u>

<u>v. Montebello Condominium Unit Owners Ass'n</u>, 243 Va. 475, 477, 416 S.E.2d 444, 445 (1992);

<u>Shackelford v. Shackelford</u>, 181 Va. 869, 877, 27 S.E.2d 354, 358 (1943); <u>Watkins v. Hall</u>, 161

Va. 924, 930, 172 S.E. 445, 447 (1934). Where terms are not explicitly found in the statute, they

may be implied if necessary. <u>Norfolk Southern Ry. Co. v. Lassiter</u>, 193 Va. 360, 365-66, 68

S.E.2d 641, 645 (1952). "'A statute often speaks as plainly by inference, and by means of the

purpose that underlies it, as in any other manner. A policy that is clearly implied is as effective

as that which is expressed.'" <u>Id.</u> at 364, 68 S.E.2d at 643 (quoting <u>Leitner v. Citizens Casualty</u>

<u>Co.</u>, 52 A.2d 687, 690 (N.J. 1947)). However, not all omitted terms may be necessarily implied.

"A necessary implication . . . is one that is so strong in its probability that the contrary thereof

cannot reasonably be supposed." <u>First Nat'l Bank v. De Berriz</u>**,** 105 S.E. 900, 901 (W. Va.

1921). Consideration of the object of the statute and the purpose to be accomplished may also

clarify the legislative intent. <u>Virginia Electric & Power Co. v. Board of County Supervisors</u>, 226

Va. 382, 388, 309 S.E.2d 308, 311 (1983).

7-Eleven argues that the Department's duty to review settlements using common law

factors must be read into the statute by implication. It reasons that 1) Code

§ 62.1-44.34:11(A)(2) permits reimbursement for the payment of judgments that have been awarded as a result of litigating property damages claims and 2) the legislature, therefore, "obviously anticipated that litigation . . . would occur, which means settlements, too, were obviously contemplated." From those premises, 7-Eleven concludes that "the legislature is presumed to intend that the common law as it had developed when the statute was enacted would provide the applicable law for statutory interpretation [regarding the factors to be used in determining whether a settlement is reasonable and necessary]." 7-Eleven reasons that the factors are "inherent" in the evaluation of settlements. Accepting 7-Eleven's reasoning *arguendo* that such factors are "inherent" in the review of settlements in the context of litigation, it does not follow, without more, that the legislature intended the same analysis be applied in an agency context.

The common law factors that 7-Eleven finds integral to and necessarily implied into the statute are set forth in three cases: Pickett v. Holland America Line-Westours, Inc., 35 P.3d 351 (Wash. 2001); Community Care Centers, Inc. v. Indiana Family and Social Services Admin., 716 N.E.2d 519 (Ct. App. Ind. 1999); and Dauphin Deposit Bank and Trust Co. v. Hess, 727 A.2d 1076 (Pa. 1999). Under the common law, the criteria generally used in assessing the reasonableness of settlement in the context of litigation

> include evaluations of (1) the risks of establishing liability and damages, (2) the range of reasonableness of the settlement in light of the best possible recovery, (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation, (4) the complexity, expense and likely duration of the litigation, (5) the stage of the proceedings and the amount of discovery completed, (6) the recommendations of competent counsel, and (7) the reaction of the [beneficiaries] to the settlement.

Dauphin, 727 A.2d at 1078.[11]

---

[11] The other cases state substantially similar factors. See Pickett, 35 P.3d at 356; Community Care Centers, 716 N.E.2d at 531.

On this record, I cannot conclude that the interpretation 7-Eleven seeks the Court to read into the statute by implication is "so strong in its probability that the contrary thereof cannot reasonably be supposed." I cannot do so on three grounds, each of which supports a contrary proposition: 1) the legislative object and purpose underlying the establishment of administrative agencies militates against such an interpretation; 2) the purported legislative intent to abrogate the fact-finding authority of the agency is not consonant with settled legal principles of review and is not clearly expressed in the statute; and 3) claims for disbursement under the statute would receive disparate treatment depending on how the third-party claim is resolved. I address each ground in turn.

As stated by the majority opinion, one ostensible statutory object and purpose of Code § 62.1-44.34:11(A)(2) is to "provide a prompt and efficient means of abating pollution caused by underground storage tanks and to facilitate payment of compensation to third parties who have suffered . . . property damage caused by release of petroleum from underground storage tanks." However, I believe the question before the Court implicates other objects and purposes that must be considered to properly construe the legislature's intent. Notably, the legislature enacts laws establishing administrative bodies in order to delegate certain authority to them. In adopting such legislation, the legislative body delegates to administrative agencies those tasks which lie within an agency's competence. Virginia Alcoholic Beverage Control Com. v. York Street Inn, Inc., 220 Va. 310, 313, 257 S.E.2d 851, 853 (1979). Absent clear indicia that the legislature intended to delegate to the agency adjudicative responsibilities that are beyond its expertise, I would find that it did not. "Complex problem[s]" should be decided by an administrate agency "in the light of its administrative experience and knowledge." Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 543 (1943). It cannot be said that the Department's administrative experience, knowledge, expertise and competence extend to the application of the common law

factors used to evaluate settlement figures, factors which were developed in the context of litigation in courts of law. Indeed, there has been no showing that such an analysis is within the Department's special competence, nor can any such competence be presumed.[12]

Second, I would find that 7-Eleven's interpretation may not be implied from Code § 62.1-44.34:11(A)(2) because, to do so, would abrogate settled principles of agency review. 7-Eleven contends that the Department is not only required to evaluate a settlement figure based on common law factors used in evaluating the reasonableness of settlements in a litigation context; it further contends that the Department may not look behind the settlement to examine and evaluate, *de novo*, the evidence underlying such a settlement. 7-Eleven's position is inconsistent with the object of the statute and overlooks the purposes to be accomplished. There is no question that the legislature intended to facilitate the payment of compensation to parties whose property was damaged by the release of petroleum from underground tanks. However, an equally important legislative purpose is reflected in its decision to interpose a state agency in the compensation process and to delegate to that agency the authority to implement it. In delegating such authority to the Department, the legislature expressly defined its role. It authorized the Department to determine whether the reimbursement for costs is reasonable and necessary. In employing such terms as, "reasonable and necessary," the legislature made clear that the authority delegated to the Department is not simply or purely ministerial. "A ministerial act is 'one which a person performs in a given state of facts and prescribed manner in obedience to the mandate of legal authority without regard to, or the exercise of, his own judgment upon the propriety of the act being done.'" Richlands Medical Ass'n v. Commonwealth, 230 Va. 384,

---

[12] I further note that, even were 7-Eleven's position to be adopted, no evidence relating to the factors relevant to assessing the reasonableness of a settlement, such as the complexity of the case, the range of jury verdicts, and other such facts that 7-Eleven asked be considered, was submitted and there has been no showing that the Agency has the expertise necessary to determine the reasonableness of settlement absent such evidence.

386, 337 S.E.2d 737, 739 (1985) (quoting Dovel v. Bertram, 184 Va. 19, 22, 34 S.E.2d 369, 370 (1945)). Rather, under the provisions of Code § 62.1-44.34:11(A)(2), the Department has been vested with the authority to *review* claims and to exercise discretion and judgment to determine the propriety of the claim before making disbursement. It follows that the exercise of such judgment necessarily requires that the agency review the underlying evidence in support of the claim to determine whether the claims made for disbursement are spurious or real, whether they are reasonable or not. "If nothing could be left to the judgment and discretion of administrative officers, government could not be efficient and the legislation itself would become 'either oppressive or inefficient.'" Bell v. Dorey Elec. Co., 248 Va. 378, 379-80, 448 S.E.2d 622, 623 (1994) (quoting Thompson v. Smith, 155 Va. 367, 379, 154 S.E. 579, 584 (1930)). Adopting 7-Eleven's interpretation would lead to the conclusion that, whenever a claim for damages has been made in a court of law, whether it is resolved by a judgment[13] or by a settlement, the Department, in discharging the legislative mandate to determine whether the claimed costs are "reasonable and necessary," has no authority to review the evidence relating to those costs and to determine whether the claim for reimbursement is supported in fact. The legislature has neither expressly nor implicitly declared that the evidence underlying a claim for reimbursement of costs is insulated from agency review simply because the issues were decided (or could have been

---

[13] 7-Eleven also argues that, in cases involving a judgment, the Department and, by extension, the agency and the court are likewise precluded from evaluating the underlying evidence to determine whether the claimed reimbursement is reasonable and necessary. Rather, the agency and the court must accept the "liquidation of the underlying claim to judgment" as "establish[ing] beyond debate the reasonable and necessary cost available for reimbursement." I also note that the only instance in which 7-Eleven believes the statute authorizes the Department to evaluate the reasonableness and necessity of the payment made in settling a claim by independently scrutinizing the underlying facts and supporting basis for that payment, is one in which compensation on a third-party claim is made outside the context of litigation. 7-Eleven provides no rationale for this distinction.

decided, as in settled cases) in a judicial forum.[14] A sea change in the law of this magnitude could not have been effected *sub silentio*. See Hughes v. Commonwealth, 39 Va. App. 448, 461-62, 573 S.E.2d 324, 330 (2002).

Finally, I note that the result that flows from 7-Eleven's interpretation of the statute is unequal in its treatment of claims. Under its interpretation, claimants that settle their cases are likely to enjoy a windfall recovery that other claimants do not. The settling claimant would be entitled to reimbursement not only for the actual costs that are proved, in fact, to have been incurred as a result of property damage and which are cognizable in law as recoverable, but also for such costs that relate to elements that bear no real relationship to those actual costs, such as the range of verdicts, the complexity and the expected length of litigation, the expertise of counsel. A claimant who presents a claim for reimbursement of a judgment paid would be limited to its evidence of actual damages.

For the foregoing reasons, I would find that 7-Eleven's claim that the Department was required to apply certain common law principles in its review of 7-Eleven's settlement is inconsistent with the legislative object and purpose in enacting Code § 62.1-44.34:11(A)(2) and that the claimed reviewing principle is therefore not "so strong in its probability that the contrary thereof cannot reasonably be supposed." First Nat'l Bank, 105 S.E. at 901. I would therefore not read into the statute by implication a requirement that the Department confine itself to a review of the reasonableness and necessity of a settlement in accordance with common law factors used to evaluate settlements and that it not review, *de novo*, the evidence to determine

---

[14] Indeed, in a case such as the one before us, questions such as the proper measure of damages and whether the evidence supports the claim would go unreviewed under 7-Eleven's interpretation except for a review of whether the settlement was within the expected range of jury verdicts, and met with other common law criteria for evaluating settlements.

whether the claim for costs that the settlement purportedly represents is supported by the evidence and the law.

## V.  Conclusion

Because I would find the construction of the statute was proper and that substantial evidence supported the Agency's findings of fact, I would affirm the trial court's decision to sustain the agency's decision.

THE COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Annunziata and Humphreys
Argued at Richmond, Virginia


7-ELEVEN, INC., F/K/A
 THE SOUTHLAND CORPORATION

                                                    OPINION BY
V.  Record No. 2380-01-2                    JUDGE ROBERT J. HUMPHREYS
                                                    DECEMBER 10, 2002
THE DEPARTMENT OF
 ENVIRONMENTAL QUALITY


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge

Wyatt B. Durrette, Jr. (Derrick L. Walker; Durrette, Irvin &
Bradshaw, P.L.C., on briefs), for appellant.

John R. Butcher, Senior Assistant Attorney General (Randolph A.
Beales, Attorney General, on brief), for appellee.


7-Eleven, Inc. ("7-Eleven") appeals a decision of the circuit court upholding a determination of the

Department of Environmental Quality denying 7-Eleven full reimbursement from the Virginia

Petroleum Storage Tank Fund for third-party damages.  7-Eleven raises four issues on appeal.  For

the reasons that follow, we affirm the decision of the trial court.

I.  Background
A.  Underlying Facts

In 1988, Hechinger, Inc. purchased a parcel of real property located in Henrico County,

Virginia.  The property was located near a parcel of property leased by 7-Eleven, Inc. (f/k/a

Southland Corporation.  On June 11, 1990, 7-Eleven reported to the State Water Control Board (the

"Board") a leaking seal on an unleaded gasoline pump located on the property.  Two days later, an

environmental consultant hired by 7-Eleven found gasoline in a spring and stream located on the

nearby Hechinger property.

7-Eleven subsequently hired a contractor to clean the affected areas, including those areas located on the Hechinger property. During the clean-up process, which was not concluded until September 1998,[15] 7-Eleven requested reimbursement from the Board for expenditures involved in correcting the petroleum release, pursuant to Code § 62.1-44.34:11(A)(2)(a) of the statutes governing the Virginia Petroleum Storage Tank Fund (the "Fund").[16] Accordingly, the Board, acting through its staff, the Department of Environmental Quality ("DEQ"), reimbursed 7-Eleven

---

[15] Although the clean-up efforts were concluded in September of 1998, it is undisputed that evidence before the Board indicated that the property would not return to its pre-injury state for some years later, the time necessary for natural attrition to take place.

[16] The relevant provisions of Code § 62.1-44.34:11, governing the Virginia Petroleum Storage Tank Fund, as they read at the time of the incident, stated the following:

> The Fund shall be administered by the Board consistent with the provisions of Subtitle I of the federal Solid Waste Disposal Act (P.L. 98-616, § 9001 et seq.) and any approved state underground storage tank program and in accordance with the following provisions:
>
> *   *   *   *   *   *   *
>
> 2. Disbursements from the Fund may be made only for the following purposes:
> a. Reasonable and necessary per occurrence costs incurred for releases reported after December 22, 1989, by the owner or operator who is the responsible person, in taking corrective action for any release of petroleum into the environment from an underground storage tank which are in excess of the per occurrence financial responsibility requirement imposed in § 62.1-44.34:12, up to one million dollars.
> b. Reasonable and necessary per occurrence costs incurred for releases reported after December 22, 1989, by the owner or operator who is the responsible person for compensating third parties, including payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank, which are in excess of the per occurrence financial responsibility requirement imposed by § 62.1-44.34:12, up to one million dollars. Disbursements for third party claims shall be subordinate to disbursements for the corrective action costs in subdivision A 2 a of this section.

for $408,838.74 of its incurred clean-up expenditures.[17]  The corrective action only partially

abated the gasoline plume in the groundwater.

Hechinger filed a motion for judgment against 7-Eleven in the Alexandria Circuit Court on

April 19, 1995.  On October 15, 1996, Hechinger filed an amended motion for judgment.  The

amended motion for judgment contained four counts with causes of action including negligence,

trespass, nuisance, and statutory liability under Code § 62.1-44.34:18(C)(4), and sought damages of

$2,000,000 plus interest, costs, and attorneys' fees.[18]  Shortly thereafter, 7-Eleven stipulated to

statutory liability under Code § 62.1-44.34:18(C)(4).  The case subsequently went to trial on the

issue of damages.  After a day and half of trial proceedings, the parties agreed to a settlement of

$575,000.

---

[17]  This amount was beyond the $50,000 7-Eleven was required to maintain as evidence
of financial responsibility, pursuant to Code § 62.1-44.34:12(B).

[18] Code § 62.1-44.34:18 provides as follows, in relevant part:

> C.  Any person discharging or causing or permitting a discharge of
> oil into or upon state waters, lands, or storm drain systems within
> the Commonwealth, discharging or causing or permitting a
> discharge of oil which may reasonably be expected to enter state
> waters, lands, or storm drain systems, or causing or permitting a
> substantial threat of such discharge and any operator of any
> facility, vehicle or vessel from which there is a discharge of oil
> into or upon state waters, lands, or storm drain systems within the
> Commonwealth, or from which there is a discharge of oil which
> may reasonably be expected to enter state waters, lands, or storm
> drain systems, or from which there is a substantial threat of such
> discharge, shall be liable to:
>
> *    *    *    *    *    *    *
>
> 4.  Any person for injury or damage to person or property, real or
> personal, loss of income, loss of the means of producing income,
> or loss of the use of the damaged property for recreational,
> commercial, industrial, agricultural or other reasonable uses,
> caused by such discharge.

## B. Administrative Hearing

By letter dated May 1, 1996, 7-Eleven notified the Board of its potential claim against the Fund for third-party damages due to Hechinger, pursuant to Code § 62.1-44.34:11(A)(2)(b). 7-Eleven notified the Board of the settlement on September 23, 1997. The DEQ held an informal fact-finding proceeding on July 12, 2000 to consider 7-Eleven's claim for reimbursement. The DEQ also allowed both parties to submit additional evidence subsequent to the hearing.

The evidence presented on the issue of damages included appraisals prepared by each party's expert witnesses, depositions of each of the experts, and Henrico County tax assessment records. The evidence demonstrated that Hechinger had purchased the property at issue in 1988 for a purchase price of $903,117. However, Hechinger's expert, Salzman Real Estate Services, Inc. ("Salzman"), opined that the pre-injury fair market value of the property was $1,300,000 ($124,820 per acre). Salzman did not offer an opinion as to the post-injury fair market value of the property. Yet, Salzman opined that Hechinger lost rental income in the amount of $710,000, and investment returns in the amount of $550,000, as a result of the environmental damage. Salzman further opined that Hechinger had to pay $283,000 in taxes, insurance, administration expenses, as well as legal fees and expert fees, that it would not have had to pay but for the contamination.

Jay B. Call, III Associates, Inc. ("Call"), an expert providing evidence on behalf of 7-Eleven, estimated the property's pre-injury fair market value as only $715,000 ($68,651 per acre). Salzberg Appraisals, Inc. ("Salzberg"), another expert for 7-Eleven, estimated the post-injury fair market value of the property to be $520,750 ($50,000 per acre). Salzberg based its opinion on an assumption that the contamination was no longer present and that the lower property value was merely a result of topographical problems that Salzberg described as "severe."

Henrico County tax assessment records appraised the property at a pre-injury value of $938,700 ($90,130 per acre), and a post-injury fair market value of $508,700 ($48,843 per acre). However, the County based its reduced assessment amount on the estimated cost to perform remediation on the property, which had already been largely completed, and for which the Board had already reimbursed 7-Eleven.

The evidence further established that Hechinger listed the property for sale in 1990, prior to the discovery of the contamination, asking for a price of $1,550,000. Hechinger was ultimately offered $800,000 for the property in 1996. In determining the amount 7-Eleven was entitled to for reimbursement, the hearing officer, J. Andrew Hagelin, Director of the Office of Spill Response and Remediation, stated the DEQ's interpretation of the standard to determine "reasonable and necessary" costs for third party claims as follows: 1) the claimant's legal liability for third party damages must be at least disputable; 2) the amount of damages claimed must be supported by the evidence; and 3) the types of damages must be eligible pursuant to the Fund's Guidelines.

After concluding 7-Eleven's liability was at least disputable, the hearing officer evaluated legal precedent concerning the availability of damages. The hearing officer considered "whether (i) the facts justif[ied] permanent, temporary or both types of damages; (ii) whether an adjustment for the partial cure of the Hechinger property should be applied; and (iii) whether an adjustment for multiple causes of damages applie[d]." He concluded as follows:

> Upon site closure, contamination remained on the Hechinger property. The Regional Office's July 7, 2000 memorandum indicates that it is simply not possible to predict how long it will take for natural attention [sic] to return the site to background levels. [7-Eleven] provided no evidence and no evidence exists in the Agency's records that indicates the remaining contamination will attenuate within a known time frame. Consequently, it is appropriate to treat the injury as permanent. That measure for permanent injury to real property pursuant to Packett v. Herbert[, 237 Va. 422, 377 S.E.2d 438 (1989),] is the permanent dimunition in the value of property.

–57–

To determine the permanent dimunition in the value of the property, the fair market value of the property after the injury is subtracted from the fair market value of the property before the injury.

In making this determination, the hearing officer disregarded the expert opinions of Salzman and Call as not credible, because they valued the property well above the amount Hechinger paid for it, and well above the county assessment amount. Further, they did not offer post-injury fair market valuations and offered damage estimates using formulae other than that prescribed in Packett.[19] The hearing officer also disregarded the opinion of Salzberg because the post-injury evaluation offered assumed no contamination was present on the property. In addition, the hearing officer disregarded the county's assessed post-injury value, because it reflected the estimated clean-up costs that the Board had already paid to 7-Eleven.

Based on the remaining evidence, the hearing officer found a reasonable range for the pre-injury fair market value of the property was $903,177 to $938,700, the pre-injury county assessment amount and the actual purchase price Hechinger paid for the property just two years before the pollution report. He found the 1996 offer of $800,000 to purchase the property a reasonable basis for estimating post-injury fair market value, as most of the clean-up expenses had already been incurred and it was not unreasonable to assume the potential buyer was aware of the condition of the parcel, and that the condition was reflected in the offer price. Accordingly, he awarded 7-Eleven $103,117 ($903,117 - $800,000) in reimbursement for third-party claim costs, finding this amount of damages most accurately reflected the actual market value of the property.[20]

---

[19] See Packett, 237 Va. at 426-27, 377 S.E.2d at 442-43.

[20] The hearing officer found that no adjustment was necessary for partial cure costs and/or the potential reduction in value of property due to the topographical problems, as he found the $800,000 offer reflected an arms-length offer made at a time when the cure of the property was nearly complete.

## C. Circuit Court Appeal

7-Eleven appealed this finding to the Richmond Circuit Court arguing that the hearing officer 1) failed to consider important factors in analyzing the reasonableness of the settlement; 2) misunderstood and misapplied the law of damages; and 3) arbitrarily and capriciously rejected the opinions of certain experts. 7-Eleven further contended that the Fund's Guidelines conflicted with Code § 62.1-44.34:11(A)(2)(b). 7-Eleven asserted that each of these issues constituted matters of law, requiring little deference to be given to the determination of the DEQ.

Following written briefs and oral argument, the trial judge issued a letter opinion finding the decision concerning "reasonable and necessary per occurrence costs" was an area involving the special expertise of the DEQ, entitling its decision to deference and making the appropriate standard of review whether the decision was supported by substantial evidence. Finding that the decision was both supported by the evidence and not arbitrary and capricious, the trial court upheld the DEQ's decision.

## II. Analysis
## A. Standard of Review

On appeal, 7-Eleven first contends that the circuit court employed an inappropriate standard of review in considering the DEQ's determination. Specifically, 7-Eleven contends that the substantial evidence standard is inapplicable to questions of law and that judicial deference to the DEQ is inappropriate in matters outside the scope of its specialized competence and expertise. We don't disagree with this basic statement of the law.

> Judicial review of agency decisions is authorized by the [Virginia Administrative Process Act]. See Code § 9-6.14:17. Issues of law specified in the statute "fall into two categories: first, whether the agency . . . acted within the scope of [its] authority, and second, whether the decision itself was supported by the evidence." Johnston-Willis Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988). Although many circumstances involve "mixed questions" of both "law and fact," issues are sometimes "oversimplified" as "legal" or "factual," a distinction that is

significant to judicial review of an administrative decision.  Id. at
243, 369 S.E.2d at 7.  The separate standards of review determine
the degree of deference, if any, to be given to an agency's decision
on appeal.  See id. at 246, 369 S.E.2d at 9.
Where the issue is whether there is substantial evidence to support
findings of fact, great deference is to be accorded the agency
decision.  Where the issue falls outside the specialized competence
of the agency, such as constitutional and statutory interpretation
issues, little deference is required to be accorded the agency
decision.  Where, however, the issue concerns an agency decision
based on the proper application of its expert discretion, the
reviewing court will not substitute its own independent judgment
for that of the agency but rather will reverse the agency decision
only if that decision was arbitrary and capricious.  Id.

Holtzman Oil Corp. v. Commonwealth, 32 Va. App. 532, 538-39, 529 S.E.2d 333, 337 (2000).

Thus, where . . . legal issues require a determination by the
reviewing court whether an agency has, for example, accorded
constitutional rights, failed to comply with statutory authority, or
failed to observe required procedures, less deference is required
and the reviewing courts should not abdicate their judicial function
and merely rubber-stamp an agency determination.

Johnston-Willis, 6 Va. App. at 243, 369 S.E.2d at 7-8.  However, where the "issue is a legal issue

which falls within the specialized competence of the Commissioner and his [action] involves the

proper application of his expert discretion, we will reverse that decision only if it was arbitrary

and capricious."  Id. at 253-54, 369 S.E.2d at 13.  Indeed, "in reviewing an agency decision, the

courts are required to consider the experience and specialized competence of the agency and the

purposes of the basic law under which the agency acted."  Id. at 246, 369 S.E.2d at 9.

"The DEQ, acting in conjunction with the Board, is the Virginia agency charged with

adminis[tering] the Tank Fund."  Holtzman, 32 Va. App. at 539, 529 S.E.2d at 337 (citing Code

§§ 62.1-44.34:10 through 62.1-44.34:13; Code §§ 10.1-1182 through 10.1-1187); see also Code

§ 62.1-44.34:11.  The legislature created the Fund directing that "[d]isbursements from the Fund

may be made" for limited purposes, including:

Reasonable and necessary per occurrence costs incurred for
releases reported after December 22, 1989, by the owner or

-60-

operator who is the responsible person, in taking corrective action for any release of petroleum into the environment from an underground storage tank which are in excess of the per occurrence financial responsibility requirement imposed in subsection B of § 62.1-44.34:12, up to one million dollars.

Code § 62.1-44.34:11(A)(2)(a). After disbursing funds for clean-up costs, the statute further authorizes the Board, through the DEQ, to utilize the Fund to pay for:

Reasonable and necessary per occurrence costs incurred for releases reported after December 22, 1989, by the owner or operator who is the responsible person for compensating third parties, including payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank, which are in excess of the per occurrence financial responsibility requirement imposed by subsection B of § 62.1-44.34:12, up to one million dollars. Disbursements for third party claims shall be subordinate to disbursements for the corrective action costs in subdivision A 2 a of this section.

Code § 62.1-44.34:11(A)(2)(b). The Board adopted regulations governing these reimbursement decisions. See 9 VA. Admin. Code § 25-590-210.

The present matter, involving the third-party reimbursement provision of Code § 62.1-44.34:11, is one of first impression in Virginia. However, as we held in Holtzman Oil Corp., "[t]he DEQ possesses the requisite experience and competence necessary to determine levels of contamination and the reimbursement due 'owners and operators' for the reasonable costs incurred for their environmental clean-up efforts," pursuant to Code § 62.1-44.34:11(A)(2)(a). Holtzman, 32 Va. App. at 539, 529 S.E.2d at 337.

Although Code § 62.1-44.34:11(A)(2)(b) involves a consideration not of the clean-up costs, but of the "reasonable and necessary per occurrence costs incurred . . . by the owner . . . who is the responsible person for compensating third parties, including judgments for bodily injury and property damage caused by the release of petroleum," we find that the DEQ likewise possesses the

requisite experience and competence necessary to determine appropriate reimbursement under this section.

Indeed, when the legislature amended the third-party reimbursement language in 1996, it inserted the phrase "reasonable and necessary" before each of the statute's relevant references to "per occurrence costs." See 1996 Va. Acts, ch. 737. In so doing, the General Assembly transferred the decision-making power in this regard to the Board and its authorized agent, the DEQ. No evidence before us discloses that it did so without first determining that the Board and its agents were fully competent to render such judgments. See Groome v. Transportation, Inc., 27 Va. App. 682, 696, 500 S.E.2d 852, 859 (1998).

In fact, the entire statute, by its very language, clearly addresses corrective measures, and the costs associated therewith, for remedying releases of petroleum into the environment from underground storage tanks. Thus, although the consideration here involves a determination of reasonable and necessary costs incurred by the responsible party, in compensating a third party, as opposed to clean-up costs, the costs to be considered are clearly set forth by the language of the statute, imposing no need to resort to statutory construction. They are those incurred as a result of compensating a third party for the damage caused by the environmental contamination at issue, an area which we have found falls within the specialized expertise and competence of the DEQ. See Holtzman, 32 Va. App. at 539, 529 S.E.2d at 337. As such, its enforcement and implementation of the statutes and regulations governing the Tank Fund's reimbursement policies in this regard, are entitled to deference by a reviewing court and should only be overturned when found to be arbitrary and capricious. Holtzman, 32 Va. App. at 538-39, 529 S.E.2d at 337.

Based upon the above, we hold that the trial court properly applied the substantial evidence standard and the arbitrary and capricious standard in reviewing the hearing officer's decision.

B.  Determination of Reasonable and Necessary Costs

7-Eleven next argues that the circuit court failed to properly analyze whether the third-party settlement was reasonable and necessary pursuant to Code § 62.1-44.34:11(A)(2).  7-Eleven contends that the trial court should have considered the settlement amount in light of the pending litigation and the potential judgment and/or jury verdict range to which 7-Eleven was exposed. 7-Eleven further contends that the trial court failed to give proper consideration to the expert opinions offered as they were based upon credible valuation methodologies and would have been admissible in court.  We disagree.

As stated above, and in respectful disagreement with the finding in the concurring opinion, the phrase "reasonable and necessary costs," as it is utilized in Code § 62.1-44.34:11(A)(2), is clear. It provides the DEQ with the <u>discretion</u> to reimburse an owner for all "reasonable and necessary" costs incurred as a result of compensating a third party for environmental contamination, except those otherwise excluded by the statute.[21]      The phrase does not confine the DEQ's determination to whether the costs are reasonable in the context of litigation.

Thus, because the statute provides the DEQ with the discretion to determine the reasonableness and necessity of all recoverable costs, and does not mandate any specific considerations beyond those parameters, 7-Eleven's argument that the DEQ should have considered factors concerning the reasonableness of the settlement is without merit.  Moreover, the dissent's contention that the DEQ was required to consider the reasonableness of the settlement disregards the plain language of the statute.

---

[21] For example, Code § 62.1-44.34:11(A)(2)(b) limits reimbursement of costs in the form of judgments to those related to "bodily injury and property damage caused by the release." Code § 62.1-44.34:11(A)(5) precludes reimbursement for costs expended for payment of interest or other finance charges on loans used for corrective action or containment, under certain circumstances.  Code § 62.1-44.34:11(A)(6) and (7) preclude reimbursement for costs incurred in the form of penalties, charges or fines imposed pursuant to applicable laws, as well as costs that are reimbursed or reimbursable from other applicable state or federal programs.

In addition, contrary to 7-Eleven's argument, neither the circuit court, nor the hearing officer, was required to give weight to the opinions offered by the various experts in this matter. Here, the issue was presented to the hearing officer as a "battle of experts." See Tidewater Psychiatric Inst. v. City of Virginia Beach, 256 Va. 136, 141, 501 S.E.2d 761, 764 (1998). As it is the fact finder who "'weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts,'" appellate courts are not free to reweigh the evidence and set aside a judgment merely because the fact finder could have drawn different inferences or conclusions or because parties feel that other results are more reasonable. Va. and Md. R.R. Co. v. White, 228 Va. 140, 145, 319 S.E.2d 755, 758 (1984) (quoting Bly v. Southern Ry. Co., 183 Va. 162, 175, 31 S.E.2d 564, 570 (1944)). Indeed, "the very essence of [the fact finder's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable." Id.

Lastly, we find no merit in 7-Eleven's contention that the hearing officer and the circuit court disregarded the temporary damage issue. The hearing officer specifically considered whether 7-Eleven was entitled to temporary damages in this case, and determined that the injuries suffered were permanent in nature as there was no evidence suggesting that the contamination would ever be completely abated, or at least within what time frame complete abatement was likely to occur.

Accordingly, because there is substantial credible evidence supporting the hearing officer's determinations, and because there is no indication in the record that the hearing officer's determinations on these issues were arbitrary and capricious, we find no error in the trial court's decision to uphold the hearing officer's judgment.

C. Application of Guidelines

Finally, 7-Eleven maintains that the Fund's Guidelines, which were promulgated by the DEQ and became effective on February 12, 1998, conflict with Code § 62.1-44.34:11(A)(2)(b) by

unlawfully restricting the damages subject to reimbursement. Specifically, 7-Eleven contends that the Guidelines fail "to recognize that under Virginia's law on tort damages" a responsible party should be "entitled to recover, if proven, all of the proximately caused damages specified in [the third-party plaintiff's] motion for judgment," as reasonable and necessary costs. 7-Eleven argues the Guidelines produce "artificial limits," inconsistent with a claimant's "real exposure to liability, which is what this court should presume the legislature intended." Once again, we disagree.

The plain language of Code § 62.1-44.34:11(A)(2)(b) clearly states that the Board is to reimburse for costs determined to be "reasonable and necessary" and that such costs include judgments for bodily injury and property damage. The Guidelines designate as eligible for reimbursement valid costs incurred by the responsible party in compensating the third party for bodily injury, damage to real property, including temporary damages and permanent damages, as well as personal property damage and lost net profits. Further, § VIII of the Fund Guidelines states:

> The Agency's acquiescence to a settlement between owner and third party does not mean that the Agency will pay the full settlement amount. Settlements and final court orders will be used as baselines from which the Agency will conduct eligibility, reasonableness, and necessity reviews.

Virginia Petroleum Storage Tank Fund Third Party Disbursements Guidelines, § VIII.

The fact that the Guidelines do not designate as eligible any and all costs incurred does not conflict with the charge given to the Board and its agents by the legislature. In fact, as stated above, the statute does not entitle a claimant to a recovery for any and all costs incurred in the form of damages. Instead, the legislature limited reimbursable costs to those that the Board, in its discretion, finds reasonable and necessary, "including payments of judgments for bodily injury and property damage." Code § 62.1-44.34:11(A)(2)(b). The legislature did not provide for reimbursement of litigation costs and/or the various damages that might be reflected in the form of a settlement. We reiterate that litigation and related settlements can often reflect inflated

and/or unnecessary costs, and even speculative damages based on the parties' theories of what a judge or jury might award.

"Where a statute is unambiguous, the plain meaning is to be accepted without resort to the rules of statutory interpretation." Last v. Virginia State Bd. of Med., 14 Va. App. 906, 910, 421 S.E.2d 201, 205 (1992). "'Courts are not permitted to rewrite statutes. This is a legislative function. The manifest intention of the legislature, clearly disclosed by its language, must be applied.'" Barr v. Town & Country Properties, Inc., 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990) (quoting Anderson v. Commonwealth, 182 Va. 560, 566, 29 S.E.2d 838, 841 (1944)). Therefore, we cannot broaden the parameters of the statute at issue as 7-Eleven suggests. To do so would conflict with the legislature's clear intention to limit the reimbursement available and to provide the Board with discretion in determining reasonable and necessary costs.

For the foregoing reasons, we affirm the decision of the trial court, upholding the award of the Department of Environmental Quality.

Affirmed.

Annunziata, J., concurring.

Although I concur in the holding of the majority opinion, I do so based on different analytical considerations, beginning with my finding the term, "costs," as it is used in Code § 62.1-44.34:11(A)(2)(a) – (b), to be ambiguous.

Code § 62.1-44.34:11(A)(2)(a) provides reimbursement by the state for:

> a. Reasonable and necessary per occurrence costs incurred for releases reported . . . by the owner or operator who is the responsible person, in taking corrective action for release of petroleum into the environment.

Code § 62.1-44.34:11(A)(2)(b) states that "costs" includes "payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank." The term "costs" is not more specifically defined under the Tank Fund statute and neither Code section makes clear whether the legislature intended to limit recovery to actual clean-up costs for the property in question or whether the term "costs" encompasses other factors, such as the costs of prosecuting a suit for such damages, settlement costs incurred in conjunction with such a suit, or damages as defined in the context of litigation.[22]

No reference to settlement costs, whatsoever, is made in the statute. The sole reference to "settlement" is found in § VIII of the Fund Guidelines, promulgated by the DEQ in 1998. The

---

[22] "The term 'costs' also has a well-defined legal meaning: Those expenses incurred by parties in prosecuting or defending a suit, action or other proceeding at law or in equity, recognized and allowed by law, and taxed against the losing party." Morgan v. Haley, 107 Va. 331, 337, 58 S.E. 564, 566 (1907). The Code sections in the matter at issue cannot necessarily be read as incorporating the traditional legal definition of the term.

reference is general in its import and, like the statute, is devoid of any definition of the

components to be considered.[23]

In short, I find the term "costs," as employed in § 62.1-44.34:11(A)(2), as well as in the

Guidelines that the DEQ promulgated, to be ambiguous and subject to statutory construction.

The ambiguity gives rise to dual inquiries:  Did the legislature intend compensation to extend to

amounts expended in settling litigation and, if so, what factors relating to settlement are to be

considered?[24]

---

[23] The Guidelines specifically provide:
> The Agency's acquiescence to a settlement between owner and
> third party does not mean that the Agency will pay the full
> settlement amount. . . .
> A.  Settlements
>    1.  Owners/operators and third parties contemplating settlement
> should obtain DEQ advance determination of the amount of
> damages identified in the settlement total, which will be eligible
> for disbursement.
>    2.  DEQ will attempt to review the proposed settlement within
> ninety days from receipt of a completed third party claim.
>    3.  For settlements, the owner/operator must demonstrate the
> basis of [his] liability to the third party and that the liability, if not
> certain, is at least fairly disputable.  DEQ reserves the right to
> review all settlements for reasonableness.

Virginia Petroleum Storage Tank Fund Third Party Disbursements Guidelines, § VIII.

[24] Among the criteria one might use in assessing the reasonableness of settlement in the
context of litigation
> include evaluations of (1) the risks of establishing liability and
> damages, (2) the range of reasonableness of the settlement in light
> of the best possible recovery, (3) the range of reasonableness of the
> settlement in light of all the attendant risks of litigation, (4) the
> complexity, expense and likely duration of the litigation, (5) the
> stage of the proceedings and the amount of discovery completed,

The principles of law that govern statutory construction are well settled. See, e.g., Grillo v. Montebello Condominium Owners' Ass'n, 243 Va. 475, 416 S.E.2d 445 (1992); Shackelford v. Shackelford, 181 Va. 869, 27 S.E.2d 354 (1943); Watkins v. Hall, 161 Va. 924, 172 S.E. 445 (1934). The most relevant to our inquiry requires the trial court to give deference to an Agency's interpretation of the legislation. As noted in Southern Spring Bed Co. v. State Corp. Comm'n, 205 Va. 272, 275, 136 S.E.2d 900, 902 (1964), "the construction given to a statute by public officials charged with its enforcement is entitled to great weight . . . and in doubtful cases will be regarded as decisive."

In its analysis, the Agency noted that it could not find any authority for 7-Eleven's proposition that factors such as the strength of the case, the potential range of jury verdicts, the likely duration of the litigation and other similar "cost of settlement" factors, were to be considered by the Agency in awarding compensation under the statute, and 7-Eleven cites none. Rather, it simply contends that, since the reimbursement statute specifically includes "judgment" as part of what might be reasonable and necessary, the legislature contemplated that litigation between owners, operators and aggrieved third parties would be instituted and that at least some of the litigation would result in settlement. From that premise, 7-Eleven concludes that the legislature intended "the traditional common law factors that are used by courts to determine the reasonableness and necessity of a settlement [such as the expense, complexity and likely duration of the litigation] to apply when the DEQ ma[kes] its initial judgement, as well as when an appellate court review[s] that decision." It cites no authority for that proposition, nor explains

(6) the recommendations of competent counsel, and (7) the reaction of the [beneficiaries] to the settlement.

Dauphin Deposit Bank & Trust Co. v. Hess, 727 A.2d 1076, 1078 (Pa. 1999).

why its proposed reasoning and conclusion necessarily follow, particularly in the context of the statute at issue here.

In this case, the Agency employed the settlement as its point of departure, as provided in the Guidelines, and determined that the amount expended in settlement was compensable, but found the statute and case law limited its consideration to the costs incurred as a result of the property damage caused by the spill, using as its measure the diminution in the market value of the property.[25]  See Packett v. Herbert, 237 Va. 422, 427, 377 S.E.2d 438, 442 (1989).  An appellate court is required to give deference to the Agency's interpretation of the statute and, "in doubtful cases [that interpretation] will be regarded as decisive."  Southern Spring, 205 Va. at 275, 136 S.E.2d at 902.  I find the trial court properly applied this rule of law.  7-Eleven also contends it is entitled to damages for "carrying costs, lost profits and lost investment income."  There is no legal authority to support the proposition that such elements of damage are compensable under the statute.  Code § 62.1-44.34:11(A)(2)(b) defines reimbursable "costs" only as: "payment of judgments for . . . property damage caused by the release of petroleum into the environment from an underground storage tank."  Furthermore, the Agency's Guidelines exclude from reimbursement "intangible property damage costs."  Guidelines, § VIII.  The Guidelines, thus, focus on damage to the property itself.

The Agency's interpretation of the statute is buttressed by the legislature's adoption of a provision defining what a third party may claim in damages as a result of a prohibited discharge. Whenever possible, we interpret separate sections of a statute as a consistent and harmonious whole so as to effectuate the legislative goal. See Virginia Elec. & Power Co. v. Bd. of County

---

[25]  In addition to its statutory analysis, the DEQ noted numerous factual problems with 7-Eleven's claim, including 7-Eleven's failure to provide the Agency with the legal theories underlying the damages it sought in the litigation and upon which settlement was premised. The Agency thus had no way to evaluate whether 7-Eleven's claims for damages other than those damages related to property damage were legally viable.

Supervisors, 226 Va. 382, 388, 309 S.E.2d 308, 311 (1983). Code § 62.1-44.34:18(C)(4) sets forth the damages which an injured third party may recover for property damage in a suit against a liable owner/operator, and specifically contemplates recovery for "loss of income, loss of the means of producing income, or loss of the use of the damaged property for recreational, commercial, industrial, agricultural or other reasonable uses, caused by such discharge." The statutory provision at issue in 7-Eleven's claim is distinguished by the absence of such language; reimbursement is explicitly limited to costs for "property damage," with no mention of lost income or profits. When interpreting statutory language, we must assume that the legislature chose with care the words it used and, where it includes specific language in one section but omits that language from another section, we presume that the exclusion of the language was intentional. See Industrial Dev. Auth. v. Bd. of Supervisors, 263 Va. 349, 353, 559 S.E.2d 621, 623 (2002).

Under the familiar principle of law governing appellate review of an Agency's construction of a statute that it is mandated to enforce, the trial court properly gave the Agency's interpretation great deference on appeal. In the absence of specific statutory language to the contrary, or clearly supportive case precedent, I find the trial court did not err in according the Agency's interpretation of the statute such deference.[26] See Holtzman Oil Corp. v. Commonwealth, 32 Va. App. 532, 538-39, 529 S.E.2d 333, 337 (2000).

Having determined the Agency properly limited its consideration of settlement "costs" to those related to permanent real property damage, the trial court concluded that the Agency used the correct measure of damages and found that substantial evidence supported its

---

[26] I further note that, even were 7-Eleven's position to be adopted, no evidence relating to the Dauphin factors relevant to assessing the reasonableness of a settlement, such as the complexity of the case, the range of jury verdicts and other such facts that 7-Eleven asked be considered, was submitted and there has been no showing that the Agency has the expertise necessary to determine the reasonableness of settlement, absent such evidence.

calculation. The evidence in the record supports the trial court's determination. Specifically, the record discloses that the Agency began its review of the settlement amount,[27] excluding all but the amount relating to the diminution of market value. Then, applying traditional principles governing the evaluation of evidence both expert and lay, together with its expertise, the Agency determined that the amount 7-Eleven sought was not reasonable and necessary, and set its award at $103,117. That determination, which was based on the application of its expert discretion, fell within the specialized competence of the Agency. The trial court may not substitute its own independent judgment for that of the Agency and will only reverse the Agency decision if it was arbitrary and capricious. See Holtzman, 32 Va. App. at 538-39, 529 S.E.2d at 337. Because I find the trial court's deference to the Agency's construction of the statute was proper and that it also properly found that substantial evidence supported the Agency's findings of fact, I would affirm its decision to sustain the Agency's decision.

---

[27] The Agency Guidelines provide: "Settlements and final court orders will be used as baselines from which the Agency will conduct eligibility, reasonableness, and necessity reviews." Guidelines, § VIII (emphasis added).

Benton, J., dissenting.

I.

The Department of Environmental Quality, which the legislature created to consolidate the programs of the State Water Control Board and four other agencies, see Code § 10.1-1182 et seq., administers the Petroleum Storage Tank Fund for the Board. See Code §§ 62.1-44.34:10 through 62.1-44.34:13. In pertinent part, the Tank Fund statute provides as follows:

> 2. Disbursements from the Fund may be made only for the following purposes:
> a. Reasonable and necessary per occurrence costs incurred for releases . . . by the owner or operator who is the responsible person, in taking corrective action for any release of petroleum into the environment from an underground storage tank which are in excess of the per occurrence financial responsibility requirement imposed in subsection B of § 62.1-44.34:12, up to one million dollars.
> b. Reasonable and necessary per occurrence costs incurred for releases . . . by the owner or operator who is the responsible person for compensating third parties, including payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank, which are in excess of the per occurrence financial responsibility requirement imposed by subsection B of § 62.1-44.34:12, up to one million dollars. Disbursements for third party claims shall be subordinate to disbursements for the corrective action costs in subdivision A 2 a of this section.

Code § 62.1-44.34:11(A)(2).

The evidence in the record proved that in June 1990, 7-Eleven reported to the Board a leaking gasoline pump at one of its properties in Henrico County. After an environmental consultant hired by 7-Eleven found petroleum in the ground and in a spring and stream, 7-Eleven hired a contractor to clean the affected areas, including contamination on a nearby parcel of property owned by Hechinger, Inc. The corrective action, however, only partially abated the petroleum plume in the groundwater. As permitted by the Tank Fund, 7-Eleven requested reimbursement from the Board for its "reasonable and necessary . . . costs" in correcting the release of petroleum into the environment. See Code § 62.1-44.34:11(A)(2)(a). The Board,

acting through the Department, reimbursed 7-Eleven for $408,838.74 of its costs. Those costs and reimbursements are not at issue in this appeal.

In April 1995, Hechinger sued 7-Eleven in the Circuit Court of the City of Alexandria for property damage caused by the petroleum release, alleging negligence, trespass, nuisance, and statutory liability under Code § 62.1-44.34:18(C)(4). The motion for judgment sought damages of $2,000,000, interest, costs, and attorneys' fees. While the litigation was pending, 7-Eleven notified the Department of its potential claim against the Tank Fund for damages to Hechinger's property. See Code § 62.1-44.34:11(A)(2)(b). After 7-Eleven stipulated to statutory liability under Code § 62.1-44.34:18(C)(4), the case went to trial in the circuit court on the issue of damages. During the second day of trial, the parties agreed that 7-Eleven would pay Hechinger $575,000 as a settlement of its $2,000,000 claim.

7-Eleven notified the Department of the settlement and sought reimbursement for the settlement amount from the Tank Fund. In support of its claim, 7-Eleven presented to the Department various documents, including exhibits prepared for and used at trial. The Department held an informal fact-finding proceeding and allowed 7-Eleven to later submit additional evidence. Based on its consideration of the evidence, the Department awarded 7-Eleven $103,117 as reimbursement for payment of property damage to Hechinger. See Code § 62.1-44.34:11(A)(2)(b). The Department found that this amount represented the diminution in the market value of Hechinger's property.

7-Eleven appealed to the circuit court, alleging the case decision was unlawful. Following written briefs and oral argument, the trial judge ruled that the Department's decision concerning "reasonable and necessary per occurrence costs" for compensating Hechinger for property damage was an issue involving the Department's special expertise. Finding that the

decision was supported by substantial evidence and was not arbitrary and capricious, the trial judge upheld the Department's decision to award only partial reimbursement to 7-Eleven.

## II.

In simple terms, the issue in this appeal is whether, in evaluating the "reasonable and necessary . . . costs" 7-Eleven incurred in compensating Hechinger for property damage caused by the petroleum release, the Department could fail to consider the reasonableness of the $575,000 settlement. Noting that its liability was indisputable, 7-Eleven contends the Department erred by failing to consider the factors reflective of the reasonableness of the settlement for damage to Hechinger's property, including "the strength of Hechinger's case heading into trial, 7-Eleven's exposure to liability and damages, the expense to the parties, the complexity of the issues presented in the litigation, the likely duration of the litigation, the amount offered at settlement, and the state of the proceedings at the time of the settlement." The Department responds that the trial judge correctly ruled that substantial evidence supported the Department's decision.

## A.

At the outset, I would note that the Assistant Attorney General conceded at oral argument that, if the litigation had gone to judgment in Hechinger's favor, the judgment amount would have established 7-Eleven's reasonable and necessary costs for purposes of Code § 62.1-44.34:11(A)(2)(b), subject only to the statutory limitation. Thus, he agreed that, if the case had gone to judgment for an amount in excess of $1,000,000, the Department would have no basis to challenge the reasonableness of the judgment amount as a necessary cost 7-Eleven incurred for the petroleum spill. A plain reading of the statute permits no other conclusion. Significantly, the Assistant Attorney General further conceded he would be "hard pressed to challenge the reasonableness of [the] settlement" 7-Eleven made in this case. Indeed, the record

reflects that neither the Department nor the trial judge found that the settlement was unreasonable or unnecessary given the circumstances of the litigation. Moreover, the Department found that "[a]t a minimum, information contained in the Department's corrective action files demonstrates that the contamination . . . originated from the [7-Eleven] release" and, thus, determined 7-Eleven's liability was "fairly disputable."

To the extent the Department concluded, without determining the reasonableness of the settlement, that 7-Eleven's settlement costs were not recoverable, the Department's decision was based on an interpretation of Code § 62.1-44.34:11(A)(2)(b) that excluded from the Code's definition of "costs" the kind of property damage settlement costs 7-Eleven incurred. Dismissing 7-Eleven's claims on its appeal to the circuit court, the trial judge ruled that "[b]ecause the statute does not tie the reasonableness requirement to the litigation arena, the Department did not need to consider the factors listed by [7-Eleven] and failure to do so was not error."

I believe those decisions are legally flawed and should be reversed.

B.

In reviewing those decisions, I would hold that no special agency expertise is necessary for a resolution of this issue.

> The sole issue involves a question of statutory interpretation. The issue does not involve "the substantiality of the evidential support for findings of fact," which requires great deference because of the specialized competence of the agency. Instead, when, as here, the question involves a statutory interpretation issue, "little deference is required to be accorded the agency decision" because the issue falls outside the agency's specialized competence.

Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996) (citation omitted). "The reviewing court may set the agency action aside, even if it is supported by substantial evidence, if the court's review discloses that the agency failed to comply with a

substantive statutory directive."  Browning-Ferris Indus. of South Atlantic, Inc. v. Residents Involved in Saving the Env't, Inc., 254 Va. 278, 284, 294 S.E.2d 431, 434 (1997).

C.

The principle is well established that "[w]ords in a statute are to be construed according to their ordinary meaning, given the context in which they are used."  Grant v. Commonwealth, 223 Va. 680, 684, 292 S.E.2d 348, 350 (1982); Loyola Fed. Savings and Loan Ass'n v. Herndon Lumber & Millwork, Inc., 218 Va. 803, 805, 241 S.E.2d 752, 753 (1978).  The clear wording of Code § 65.1-44.34:11(A)(2)(b) provides that an owner may recover "[r]easonable and necessary . . . costs incurred for releases [of petroleum from an underground storage tank] . . . , including payment of judgments for bodily injury and property damage."  In the context of the statute, the word "costs" means "an item of outlay incurred in the operation of a business enterprise."  Webster's Third New International Dictionary 515 (1981), or as more generally understood, "the expenditure or outlay of money."  Id.

Except as generally circumscribed by the Tank Fund scheme, Code § 65.1-44.34:11(A)(2)(b) does not contain an exclusive listing of costs to be reimbursed and clearly does not exclude money paid in a settlement for property damage as a factor to be used in determining the "[r]easonable and necessary . . . costs" of an owner.  Moreover, the statutory directive to consider "payment of judgments for . . . property damage caused by the release of petroleum" as a measure of the "[r]easonable and necessary per occurrence costs" clearly encompasses settlements that occur during litigation concerning the property damage.  Because the statute is without limitation in defining the type of costs recoverable by an owner who has compensated a third party for damage caused by a petroleum release from an underground tank, a plain reading of the statute manifests an intention that settlement expenses are "costs" contemplated by the legislature.

By specifically denoting that "[r]easonable and necessary . . . costs" would "includ[e] payment of judgments for . . . property damages," the legislature obviously contemplated that litigation might occur and that any resulting judgment would be included in the determination of costs to be reimbursed from the Tank Fund.  Code § 62.1-44.34:11(A)(2)(b).  In addition, however, the statutory term "costs," is inclusive of the expenditures an owner makes to third parties for property damage and does not pertain exclusively to judgments as the Department suggests.  The clear and ordinary language of the statute manifests that "[b]y the use of the term 'including,' [the legislature] indicated that the specifically mentioned [payments] are not exclusive."  Herb's Welding, Inc. v. Gray, 470 U.S. 414, 423 n.9 (1985).  I would hold that the wording of the statute leaves no doubt that the legislature envisioned legal actions being brought against owners for petroleum spills and that the legislature intended that the monetary result of those legal actions for property damage, including settlements, be included as a costs to be reimbursed.

Furthermore, our reading of the statute must be governed by the following principles:

> Every statute is to be read so as to "promote the ability of the enactment to remedy the mischief at which it is directed."  Natrella v. Board of Zoning Appeals, 231 Va. 451, 461, 345 S.E.2d 295, 301 (1986) (quoting Jones v. Conwell, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984)).  The ultimate purpose of all rules of construction is to ascertain the intention of the legislature, which, absent constitutional infirmity, must always prevail.  All rules are subservient to that intent.  Shackelford v. Shackelford, 181 Va. 869, 877, 27 S.E.2d 354, 358 (1943).  Further, it is a universal rule that statutes . . . , which are remedial in nature, are to be "construed liberally, so as to suppress the mischief and advance the remedy," as the legislature intended.  Shumate's Case, 56 Va. (15 Gratt.) 653, 661 (1860) (emphasis added).

Board of Sup. v. King Land Corp., 238 Va. 97, 103, 380 S.E.2d 895, 897-98 (1989).

The Tank Fund is a part of a broader scheme of the State Water Control Law adopted to protect the quality of state waters and to prevent any increase in pollution.  Code § 62.1-44.2. "Monies held in the Tank Fund originate from expenses and penalties recovered pursuant to

various provisions of state and federal law, fees levied on fuel sold, delivered and used in the Commonwealth, and interest earned on monies in the Fund." May Dep't Stores Co. v. Commonwealth of Va., Dep't of Environmental Quality, 29 Va. App. 589, 598, 513 S.E.2d 880, 884 (1999) (citing Code §§ 62.1-44.34:11, 62.1-44.34:13). The Tank Fund was designed to provide for a prompt, efficient means of abating pollution caused by underground storage tanks and to facilitate payment of compensation to third parties who have suffered bodily injury and property damage caused by release of petroleum from underground storage tanks. The statute renders irrelevant whether the third party has been compensated for those injuries by a judgment or by a reasonable settlement prior to judgment.

In determining the costs to be reimbursed, the Department can only fulfill its responsibility under the statute -- to ensure that the public interest is served -- if it considers the reasonableness of the cost of settling litigation. This conclusion is buttressed by long-standing "settled principles of law," which the Supreme Court has recognized as a matter of public policy and equity, that "'[t]he law favors compromise and settlement of disputed claims.'" Snyder-Falkinham v. Stockburger, 249 Va. 376, 381, 457 S.E.2d 36, 39 (1995) (citation omitted); see also Eggleston v. Crump, 150 Va. 414, 418-19, 143 S.E. 688, 689 (1928). Indeed, here, where the issue of liability is uncontested, it would be contrary to the clear meaning of the statute and, furthermore, would be incongruous and injurious to public policy to hold that the Department could fail to consider the settlement costs as a factor in determining reasonable and necessary costs for property damage caused by 7-Eleven's petroleum spill.

The Department's interpretation leads to a costly and irrational result. Because the Department's decision creates uncertainty in what is reimbursable, owners who caused spills would be forced to reject most reasonable settlements in favor of adjudication. Owners would refuse to settle whenever the difference between the proposed settlement and what they estimate

the Department is willing to pay is greater than the difference between the potential judgment and the fund's maximum pay-out limit. For example, in this case, after paying the clean up costs, because the Tank Fund has a pay-out cap of one million dollars, $585,937 is available for third-party claims. Minus the $150,000 deductible, the Tank Fund is liable up to $435,937. At this point, the owner faces a tough decision. Assuming, as in this case, the Department assesses the damage to the third party at an amount less then the deductible, the owner can either pay the full value of the settlement out of its own pocket, or it can adjudicate. If the owner chooses to adjudicate, because the Department must consider court judgments as reasonable "costs," as long as the judgment does not exceed $435,937 above the value of the proposed settlement, the owner's out of pocket exposure will be less. In this case, that means as long as the amount of the judgment is estimated to be less than $1,010,037, 7-Eleven should adjudicate. Assuming judgments are generally higher than settlements, the Department will pay more out of the Tank Fund because owners have great incentive to adjudicate.

The Department does not offer and I do not discern any logical reason why the legislature would have intended to differentiate between reimbursement for settlements and reimbursement for judgments. If we read the statute, as we must, to promote its ability to "remedy the mischief at which it is directed," Kind Land Corp., 238 Va. at 103, 380 S.E.2d at 897, the statute inexorably and logically manifests the conclusion that settlements of legal actions would occur, that settlements would be judged by determining the reasonableness of the settlement, and that the amount of a reasonable settlement would also be an item the Department would reimburse as "reasonable and necessary . . . costs." Thus, I would hold that the Department's interpretation of the statute to preclude recovery of settlement costs is contrary to a plain reading of the statute which requires, subject only to the statutory limitation of one million dollars, that costs an owner

-80-

incurs for compensating third parties for property damage caused by petroleum releases be reimbursed based on whether they are reasonable and necessary.

D.

Significantly, the Department now recognizes in the preamble to its Guidelines, which were adopted on February 12, 1998, after 7-Eleven settled the litigation, that "disbursements . . . may be made for costs incurred . . . to compensate third parties for the <u>reasonable and necessary costs of settlements</u> and judgments for . . . property damage." Virginia Petroleum Storage Fund Third Party Disbursement Guidelines (emphasis added). To implement that policy, the Guidelines now provide that the Department will "<u>review all settlements for reasonableness</u>." Guidelines, VIII (A)(3) (emphasis added). This policy, which the Department apparently derives from the authority of the statutes is precisely the remedy 7-Eleven contends is mandated by the statutes and pre-existed the adoption of the Guidelines.

Neither the Department in its fact finding nor the trial judge on review determined that $575,000 was an unreasonable amount to settle the pending property damage litigation or that $575,000 was not within the range of a judgment of a rational jury had the litigation, which already had consumed a day and one-half at trial, proceeded to judgment on the merits. <u>See Dauphin Deposit Bank and Trust Co. v. Hess</u>, 727 A.2d 1076, 1078 (Pa. 1999) (holding that criteria used in assessing the reasonableness of settlement "include evaluations of (1) the risks of establishing liability and damages, (2) the range of reasonableness of the settlement in light of the best possible recovery, (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation, (4) the complexity, expense and likely duration of the litigation, (5) the stage of the proceedings and the amount of discovery completed, (6) the recommendations of competent counsel, and (7) the reaction of the [beneficiaries] to the settlement"). Likewise, the record contains no finding that a $575,000 judgment by a jury for the property damage would

have been so excessive as to require a trial judge to set it aside or as to require an appellate court to do the same. See Edmiston v. Kupsenel, 205 Va. 198, 202, 135 S.E.2d 777, 780 (1961). The majority opinion's suggestion that, prior to the adoption of the Guidelines, the Department had the discretion to refuse to consider the settlement as a "costs" is simply based on a misreading of the Tank Fund statutes.

E.

Without assessing any of the issues concerning the likelihood of success at trial or the reasonableness of the settlement, the Department made its own judgment that the lowest values were more credible and found as follows:

> Based on the valuation information provided, a reasonable range for the permanent damages was between $138,700 and $103,117 (i.e., $938,700 or $903,117 minus $800,000). It is not necessary to make an adjustment to reflect partial cure costs, because the $800,000 offer [to purchase the property] appeared to be from an arms-length buyer and was made at a time when the cure of the property was nearly complete. Additionally, the evidence does not clearly demonstrate that topographical problems at the site affected the offer price. Therefore, [7-Eleven] will be given the benefit of the doubt on this issue, and no adjustment will be required to address this alleged cause of reduced property value. For the foregoing reasons, third party claim costs in the amount of $103,117 are approved, as this amount reflects actual market values.

This record clearly "demonstrate[s] an error of law . . . [concerning] compliance with statutory authority." Code § 9-6.14:17. In short, the Department did not evaluate the reasonableness and necessity of the settlement but, instead, reviewed the evidence developed during the litigation and decided, independent of the litigation risk, an amount it believed represented the diminution of the fair market value of the property. The Department then ruled that this amount constituted the reasonable and necessary costs to be reimbursed.

Put simply, the Department's decision was contrary to the plain language of the statute. "Since the issue before us is purely one of law, containing no underlying factual issues, we do

not apply a presumption of official regularity or take account of the experience and specialized competence of the administrative agency." Browning-Ferris Indus., 254 Va. at 284, 492 S.E.2d at 434. A reviewing court may reverse an agency's determination where the agency's decision is based on an improper statutory interpretation. Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 242, 247, 369 S.E.2d 1, 10 (1988).

> Code § 9-6.14:19, a part of the Administrative Process Act, controls the action a . . . court may take when it finds a case decision "to be not in accordance with law under § 9-6.14:17." Among the errors of law addressed in the latter statute is failure of the agency to comply "with statutory authority" and failure of the agency to observe "required procedure." § 9-6.14:17(ii) and (iii). When the court finds the case decision to be unlawful on these grounds, it "shall suspend or set it aside and remand the matter to the agency for such further proceedings, if any, as the court may permit or direct in accordance with law." § 9-6.14:19.

Virginia Bd. of Med. v. Fetta, 244 Va. 276, 280, 421 S.E.2d 410, 412 (1992).

For these reasons, I would hold that because Code § 62.1-44.34:11(A)(2)(b) requires the Department, in administering the Tank Fund, to assess the "reasonable and necessary . . . costs incurred for releases . . . by the owner . . . for compensating third parties, including payments of judgments for . . . property damage caused by the release," the Department erred when it failed to assess the reasonableness of the settlement and failed to determine as a factor in reimbursing 7-Eleven for its reasonable and necessary costs the settlement amount paid by 7-Eleven to Hechinger.

III.

7-Eleven additionally contends the Department's Guidelines impermissibly restrict recovery of property damage. The Department responds that the question of which costs are eligible for reimbursement is an issue of fact and that 7-Eleven's evidence failed to prove other costs were attributable to the spill. Alternatively, the Department contends that 7-Eleven's other costs were "intangible property damage costs and interest" which the Department properly

excludes from the Guidelines. Assessing these arguments, the trial judge ruled that "[t]he Department [was within] . . . its discretion [in concluding] that those costs associated with permanent damages to property which are both reasonable and necessary are either the diminution in value of the property or the cost to restore the property."

A.

The Guidelines provide in pertinent part as follows:

> Costs incurred by owners/operators, in compensating third parties for real property damage proximately caused by a release from an owner's/operator's eligible tank, which are eligible for disbursement from the Fund include the following:
> 1. For temporary damage to real property, the decrease in rental value during the continuance of the injury, and
>
> 2. For permanent damage to real property, the lower of (I) the diminution in the value of the real property and fixtures (as determined after completion of corrective action) or (ii) the cost to restore the real property to its condition prior to the injury.

Guidelines VI(C).

In granting the Department the discretion to determine whether costs an owner incurred "for compensating third parties . . . for property damage caused by the release of petroleum" were reasonable and necessary, Code § 62.1-44.34:11(A)(2)(b), the General Assembly obviously intended that the Department determine, on a case-by-case basis, which costs would be reimbursed. In other instances, where a statute has given an agency such discretion, we have reversed agency action, noting that, "[a]lthough the statute authorizes the use of discretion, the current policy guidelines allow no discretion to be exercised in determining [the statutorily delegated function]." Woods v. Commonwealth, 26 Va. App. 450, 458-59, 495 S.E.2d 505, 509 (1998).

By restricting recovery of property damages to only those specifically listed in the Guidelines, the Department concluded as a matter of law that other costs would not be reimbursed. The trial judge ruled that the Department's interpretation of permissible damages for permanent injury to real property was "implemented through the Guidelines . . . [and was not] arbitrary and capricious." I would hold that the trial judge erred in applying this standard.

B.

Limiting permanent damages to the diminution in the value of the property, the Department ruled as follows:

> Upon site closure, contamination remained on the Hechinger property. The Regional Office's July 7, 2000 memorandum indicates that it is simply not possible to predict how long it will take for natural attention [sic] to return the site to background levels. [7-Eleven] provided no evidence and no evidence exists in the Agency's records that indicates the remaining contamination will attenuate within a known time frame. Consequently, it is appropriate to treat the injury as permanent. The measure for permanent injury to real property pursuant to Packett v. Herbert is the permanent diminution in the value of the property.
> To determine the permanent diminution in the value of the property, the fair market value of the property after the injury is subtracted from the fair market value of the property before the injury.

The Department improperly relied on Packett v. Herbert, 237 Va. 422, 377 S.E.2d 438 (1989), to conclude that permanent damages are limited to the diminution in the value of the property.

It is well settled that a party may recover for all damages proximately caused by another party's tortious conduct. Lochaven Co. v. Master Pools by Schertle, Inc., 233 Va. 537, 541, 357 S.E.2d 534, 537 (1987). The Supreme Court held in Lockhaven Co. that "[t]he measure of damages in a negligence action is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct." 233 Va. at 541, 357 S.E.2d at 537. Indeed, the Court has held that a jury may properly "assess damages for defendant's conduct in diminishing the value of plaintiffs' properties, for continuously interfering with the enjoyment of

that property, and for causing material disturbance or annoyance to plaintiffs in their use and occupation of the property." National Energy Corp. v. O'Quinn, 223 Va. 83, 91, 286 S.E.2d 181, 186 (1982).

Where, as 7-Eleven contends in this case, Hechinger sued for and was entitled to carrying costs, lost profits, and lost investment income proximately caused by 7-Eleven's conduct, such costs are recoverable under Virginia tort law if proved. Id. See also Raleigh Court Corp. v. Faucett, 140 Va. 126, 142, 124 S.E. 433, 437-38 (1924) (permitting recovery for "temporary and permanent damage . . . done to the plaintiff's lot [of land]"). Indeed, Code § 62.1-44.34:18(C)(4), which addresses an owner's liability for the petroleum spill, recognizes potential liability for "damage to . . . property, . . . loss of income, loss of the means of producing income, or loss of the use of the damaged property for . . . commercial, industrial, . . . or other reasonable uses, caused by such discharges." The record contains the expert appraisals on the pre-injury and post-injury value of Hechinger's property. The record also contains the opinion of Salzman Real Estate Services, Inc., an expert hired by Hechinger, that Hechinger incurred as a result of the spill lost rental income of $710,000 and lost investment returns of $550,000. Salzman calculated that Hechinger had also incurred and paid as property expenses resulting from the spill $283,000 in additional insurance, taxes, administrative expenses, legal fees, and expert fees.

The Department did not consider whether the expenses Hechinger claimed in the litigation represented the damage caused by the petroleum spill. Once the Department summarily concluded that it was appropriate to treat the damages in the present case as permanent because no evidence proved that the damage to the property "[would] attenuate within a known time frame," the Department declined to address whether damages, other than the diminution in the value of the property, were also appropriate. Indeed, the Department's decision

states that proof of lost investment income, lost rental income, and carrying costs were not considered because they did not conform to the damage formula prescribed in Packett.

In Packett, upon which the Department relied in limiting its award to only diminution in value of the property, the Supreme Court did not preclude recovery of other damages. See 237 Va. at 426-27, 377 S.E.2d at 442. The Court simply held that it would be improper to allow both an injunction and permanent damages because both remedied future harm, i.e., while permanent damages compensate for the future harm, an injunction eliminates future harm. Id. In so ruling, the Court noted that in Miller v. Trueheart and Others, 31 Va. 569, (4 Leigh) 569 (1833), a party properly was entitled to temporary damages and later an injunction. Packett, 237 Va. at 427, 377 S.E.2d at 442. Such damages do not constitute an improper double compensation to the injured party because the temporary damages compensate for past harm while the injunction remedies future harm. See Faucett, 140 Va. at 142-43, 124 S.E. at 437-38 (holding that a party was entitled to receive both temporary and permanent damages for property injury).

## C.

Without permitting double recovery, the Department should have analyzed whether any of the other expenses alleged by Hechinger were proximately caused by the petroleum spill and were properly encompassed by the settlement. I would hold that because the Department determined without factual analysis that 7-Eleven was not allowed to recover as costs other items that Hechinger alleged as expenses resulting from the property damage, the Department erred as a matter of law in its assessment of the extent of 7-Eleven's liability to Hechinger for property damage.

IV.

For these reasons, I would reverse the judgment and remand for reconsideration with instructions to analyze the reasonableness of the settlement, giving due consideration to the property damages for which 7-Eleven was liable to Hechinger.  Therefore, I dissent.